**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 13-cv-01761-CMA-MJW


**PHILIP WHITE,**

**Plaintiff,**

**v.**

**ROBERT WYCKOFF and**
**KYLLION CHAFIN,**

**Defendants.**
_____

**REPORTER'S PARTIAL TRANSCRIPT**
**(Jury Trial - Day 1 - Excluding Voir Dire)**
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 8:08 a.m. on the 26th
day of October, 2015, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
DAROLD W. KILLMER, MARI A. NEWMAN and ANDREW J. MCNULTY,
Killmer, Lane & Newman, LLP, 1543 Champa St., Suite 400,
Denver, CO 80202


**FOR THE DEFENDANT:**
THOMAS J. LYONS and MARK S. RATNER, Hall & Evans, LLC,
1001 17th St., Suite 300, Denver, CO 80202

# I N D E X

**WITNESSES:**                                            **PAGE**

### PHILIP WHITE
DIRECT EXAMINATION BY MS. NEWMAN                    68

### DR. EDWARD DENT
DIRECT EXAMINATION BY MS. NEWMAN                    93
CROSS-EXAMINATION BY MR. LYONS                      145
REDIRECT EXAMINATION BY MS. NEWMAN                  177

# E X H I B I T S

**NO.**                                              **ADMITTED**

 1   ..........................................   101
22   ..........................................   106
26   ..........................................   132
27   ..........................................   136
29   ..........................................    78

**No.**                                              **REFUSED**

..........................................

1                      **OCTOBER 26, 2015**

2           (Proceedings commence at 8:08 a.m.)

3           THE COURT:  We are on the record in Civil Case No.

4    13-cv-01761, encaptioned Philip White v. Robert Wyckoff

5    and Kyllion Chafin.

6           Counsel, would you please enter your appearances.

7           MR. KILLMER:  Good morning, Your Honor, Darold

8    Killmer, Mari Newman, and Andrew McNulty on behalf of the

9    plaintiff, Mr. White.  I would also like to introduce our

10   paralegal, Jesse Askeland.

11          THE COURT:  And how do you spell that?

12          MR. KILLMER:  J-E-S-S-E A-S-K-E-L-A-N-D.

13          THE COURT:  All right.  Thank you.

14          MR. LYONS:  Good morning, Your Honor, Thomas Lyons,

15   with the firm of Hall & Evans, on behalf of the

16   defendants, Kyllion Chafin and Robert Wyckoff.  I am here

17   with counsel, Mark Ratner, and our paralegal, Amber

18   Tambrello, T-A-M-B-R-E-L-L-O.

19          I would also like the record to reflect that

20   Mr. White is present.

21          THE COURT:  All right.  Who else is sitting at the

22   table?

23          MR. LYONS:  I beg your pardon, this is my client,

24   Kyllion Chafin.  Next to him is my client, Robert Wyckoff.

25          THE COURT:  I understand there are a few matters to

1    be brought to my attention.

2         MR. LYONS:  Your Honor, there are, if I may.  I

3    don't know maybe plaintiff's counsel does, too.

4         THE COURT:  You may proceed.

5         MR. LYONS:  Thank you.  Your Honor, based upon what

6    you have told us last Monday, I want to make sure that the

7    record reflects that the defendants intend to follow the

8    Court's direction with respect to the examination of

9    witnesses who may be called in the defense case while they

10   are on the stand in the course of the plaintiff's case.

11        As I understand that ruling, we are to examine our

12   witnesses as though they would have testified in the

13   defense case, even though the plaintiff's won't have

14   rested their case.  Because that is true, I would like to

15   preserve the opportunity on behalf of the defendants to

16   make motions at the point in time when the plaintiff rests

17   its case, otherwise I would be concerned that the record

18   would be unclear about that point.  So we want to preserve

19   that right.

20        THE COURT:  You have the right to make mid-trial

21   motions.

22        MR. LYONS:  Thank you, Your Honor.

23        Next, I also want the Court to know, counsel put

24   forth, plaintiff, as well as defense counsel, have agreed

25   upon a synchronized video version, which has now been

1    marked as Exhibit 46, and tendered to the Court for

2    purposes of its use as an exhibit in this matter.

3          THE COURT:  Hold on.  Let me staple this so it

4    doesn't fall apart on me.

5          Exhibit 46?

6          MR. LYONS:  Yes, Your Honor.  I want to make sure

7    the Court was aware of that.  I also believe we ought to

8    have some issue discussed or some consideration given to

9    the point of when that video or any of the other materials

10   that are electronic in nature will be played for the jury

11   in this regard.  It occurs to me a lot of time could be

12   wasted if we play pieces and parts of the various

13   different video evidence when it has been stipulated to be

14   in evidence in this case.

15         So my suggestion would be for the Court to consider

16   whether we set aside a little bit of time, and we can tell

17   you how much time that would be, to simply play the

18   synchronized video for the jury, as well as the video

19   interview between Mr. White and Lieutenant Wyckoff.  And

20   that way what we do is manage it once.  If plaintiff's

21   counsel wants to pull out parts of it, I understand they

22   may well want to, or the defense would like to do that.  I

23   understand the propriety of doing that, as well.

24         But I am trying to figure out a way to make this as

25   an efficient as possible way for the jury.

1          MR. KILLMER:  I think it makes sense.  And for that

2     reason, we intend to show both of those in our opening

3     statement, so they will have the full context.  And then

4     if portions are talked about during the examinations, they

5     will already have seen it.  So I think Mr. Lyons' general

6     point is right, that is how we propose to solve it.

7          THE COURT:  All right.  Any objection to that?

8          MR. LYONS:  No, Your Honor.  I don't have an

9     objection to it, other than the fact that I think if it is

10    played just in the opening, what happens is the plaintiff

11    seems to be the proponent of the evidence.  As I say, it

12    is a stipulated exhibit.  So I would appreciate it if we

13    would do it this way:  As part of the evidence in the case

14    at the outset, and then the opening statements are given,

15    if that is the way we do it.

16         THE COURT:  How long are the videos?

17         MR. LYONS:  I believe the one involving the

18    synchronization is something around half an hour maybe.

19         THE COURT:  We are not playing that in opening.

20         MR. KILLMER:  That is not that long.  There is an

21    awful lot of non-action at the very front and very end of

22    the video.  It is probably 7 or 8 or 9 minutes of relevant

23    video on the first one.  The second one is 5 minutes.

24         MR. LYONS:  I disagree.  I don't think that is

25    true.  I think the video, itself, has to be played in its

1    entirety.  It has been stipulated into evidence in this

2    matter.  And there are pertinent parts of that video that

3    need to be shown to the jury.

4         If plaintiff's counsel wants to show parts, I

5    understand that.  But I think we have to do it as a whole

6    at the outset so the jury has an understanding of what

7    occurred.

8         THE COURT:  The other video you said --

9         MR. LYONS:  I believe that is about 12 minutes.  I

10   am not quite sure.  We can figure out an exact number.

11   That is the interview between Mr. White and Sergeant

12   Wyckoff.

13        MR. KILLMER:  I think the second one, by the way,

14   is less than 6.  Five minutes 36 seconds, something like

15   that, not 12.

16        THE COURT:  Are you playing that in opening?

17        MR. KILLMER:  We are playing -- the first one is

18   the Greyhound surveillance video.  We are playing that

19   from the relevant time when the police officer -- well,

20   the 911 call is synched in.  So Mr. White calls 911.

21   Therefore, we were able to put audio on top of the video,

22   and that is the stipulated exhibit.  That is really where

23   the action starts.

24        So we will play from a little bit before that, so

25   Ms. Newman can set the stage and tell people where things

 1    are, while watching a little bit of silent non-active

 2    stuff, and then the video with the 911 call that then

 3    Officer Chafin comes in.

 4            THE COURT:  I don't see any problem, since it is

 5    stipulated, with plaintiff using it in their opening.  But

 6    we can, at the beginning, or you can at the beginning of

 7    your case, however you want to do that.  You can play it

 8    during the trial or at whatever point you think is

 9    appropriate.

10            MR. LYONS:  I would like to play both videos at the

11    beginning of the trial.

12            THE COURT:  To set the stage?

13            MR. LYONS:  That is the only way I see to do that.

14            THE COURT:  Let me tell you that, on the site

15    visit, I think the best time to do it would be right

16    before we close for the day on Tuesday.  So I think about

17    2 o'clock in the afternoon we can go across there, and

18    then the jury can be excused and then go on home.  All

19    right.

20            MR. LYONS:  That was my next point to ask about

21    that.

22            MR. KILLMER:  That is fine.

23            THE COURT:  I understand the plaintiff, though, has

24    a witness they have to get through today.

25            MR. KILLMER:  That's correct.

 1              THE COURT:  All right.  That witness is whom?

 2              MR. KILLMER:  His name is Dr. Dent.  He will be

 3    testifying this afternoon.

 4              THE COURT:  What will he testify to?

 5              MR. KILLMER:  He is Mr. White's physician.  So it

 6    is medical testimony.  He lives up in Eagle and has

 7    patients the rest the week.

 8              THE COURT:  All right.  So we play the video.  We

 9    chose a jury.  Normally what happens, although I am pretty

10    quick about choosing a jury, we will probably recess early

11    for lunch, let them go to lunch, and then come back in the

12    afternoon and go.

13              So I would assume what we will do is I will give

14    some thought to whether or not we should play those at the

15    beginning of the -- before we begin the evidence, whether

16    we should play the videos, or however much is coming from

17    Ms. Newman's opening.  I don't want it to be redundant.  I

18    don't want to have them sit through two videos.

19              It is their right to do whatever they want to do as

20    long as it is not argument in their opening statement, so

21    I will consider that, then move on to the testimony.  So

22    is he the first witness?

23              MS. NEWMAN:  Our expectation is that we will call

24    Mr. White, then break his testimony early to have Dr. Dent

25    testify this afternoon, then bring Mr. White back on

1    tomorrow morning to finish him up, because his testimony

2    will take long enough, and it makes sense to do that.

3            THE COURT:  All right.

4            MS. NEWMAN:  But I appreciate the Court's

5    consideration regarding being redundant.  I think in

6    opening, to play it again, is going to be excruciating,

7    since it will be in witness examinations, as well.

8            THE COURT:  Mr. Lyons, anything further?

9            MR. LYONS:  Your Honor, we tendered a limiting

10   instruction with respect to the settlement situation to

11   the Court.  And obviously we don't know yet -- I know the

12   plaintiff's counsel has responded.  We don't know how the

13   Court will handle that.  Normally in this regard -- my

14   concern about that, Your Honor, is we don't want to do

15   anything to thwart the Court's direction concerning any

16   examination about that.

17           THE COURT:  Well, the question I have, the limiting

18   instruction is "there was testimony in this case regarding

19   claims made against former --" actually, I would be giving

20   this at the time, so it should be, "you are about to hear

21   testimony in this case regarding claims made against

22   former defendants Code-3 and Daniel Burke.  You are

23   instructed not to consider the amount of any settlement

24   payment made in deciding Mr. White's claims against

25   Officer Chafin and Lieutenant Wyckoff.  You may consider

1    Mr. White's claim against those former defendants when

2    considering his claims that harm was done to him on May

3    22, 2012."

4         I guess I am a little unclear as to what the

5    relevance is if that is the limiting instruction I give

6    them, because my view was it might be relevant to -- I

7    think it was Mr. Burke and Officer Chafin that caused the

8    cut on his head when they used the excessive force.  I

9    thought it would relate to the damages, but this

10   instruction says it doesn't; you are not to consider that

11   in deciding his claims.

12        MR. LYONS:  Your Honor, there is difference between

13   damages and settlement.  I think the distinction the

14   defendant would draw is that Mr. White accused Mr. Burke

15   of laying hands on him and causing him damage, including

16   damages in the nature of assault and battery or both.

17        THE COURT:  You are saying they can consider for

18   purposes of liability?

19        MR. LYONS:  Well, Your Honor, I don't know that

20   they couldn't.  They can divide this.  That is one of the

21   reasons it is necessary for someone to make it clear to

22   the jury that settlement has nothing to do with the

23   question of whether or not Mr. White contended that

24   Mr. Burke harmed him.

25        THE COURT:  So then when you say "not consider the

1    amount," what you really are saying is "not to consider

2    the settlement in deciding Mr. White's claims against

3    Officer Chafin"?

4        MR. KILLMER:  I think the better course, wouldn't

5    it be, is to just have nobody talk about a settlement.

6        THE COURT:  I have already ruled on that.  If it is

7    relevant to their defenses, in that the claim was that it

8    was both Daniel Burke and Officer Chafin who caused that

9    damage, and they settled with one, I think it is relevant

10   to their claims.

11       MR. KILLMER:  Well, I don't believe the Court did

12   rule on that.  I thought you took it under advisement.

13       THE COURT:  I took it under advisement, but I gave

14   you my direction.  We will see if it comes up, whether

15   there has been enough groundwork laid to make it relevant

16   today.

17       MR. KILLMER:  But here is what I think is the law.

18   Under Section 1983, the damages are joint and several.  So

19   even if they were both involved in it, they are each

20   responsible for the entirety of the damage.

21       THE COURT:  Then the amount would be relevant.

22       MR. KILLMER:  No.  No.

23       THE COURT:  He can't get double compensated.  If

24   you have settled for X amount of dollars, and the jury

25   found it is Y, then it is X minus Y that he is responsible

1    for.

2             MR. KILLMER:  That is not true under 1983.

3             THE COURT:  Joint and several.  That is what joint

4    and several means.

5             MR. KILLMER:  They are both responsible for the

6    entirety of the damages.

7             THE COURT:  But not double damages.

8             MR. KILLMER:  Not double damages.  I need to inform

9    the Court -- and this is slightly delicate, because the

10   settlement agreement with Code-3 is confidential, but

11   there is an exception if the Court orders me to tell the

12   Court some of the terms.  So I would like you to order me

13   to tell you some of the terms.

14            THE COURT:  You are ordered to tell me what the

15   terms are so I can determine whether there is relevance.

16            MR. KILLMER:  That is what I needed.  One of the

17   provisions of the settlement agreement is an

18   acknowledgment that the payments made in the Code-3 and

19   Burke settlement agreement are not for damages caused

20   during the event that was jointly done with Officer

21   Chafin.  So these are damages from Burke specifically, and

22   specifically acknowledge not to be damages caused by

23   Chafin.  That is a provision in the settlement agreement

24   which anticipated this.

25            THE COURT:  How, for purposes of this trial, do we

1    separate what damages were caused by Burke, what damages

2    were caused by Officer Chafin?  The jury is going to have

3    that question in their mind, I will tell you.

4         MR. KILLMER:  They may have it in their minds.

5    They are instructed they shouldn't take it into account.

6    They should determine the damages caused by the event and

7    award those.  That is the point of 1983.

8         THE COURT:  Then as a matter of law, am I to deduct

9    whatever the damages are?  Am I to deduct the amount that

10   you all settled for from the amount they seek?

11        MR. KILLMER:  Well, you can't under this situation

12   because --

13        THE COURT:  Then he gets double compensated.

14        MR. KILLMER:  He does not.

15        THE COURT:  It is joint and several, if they cannot

16   be separated, it is all one, and you have settled X amount

17   here, and the jury awards Y for the whole thing, then Y

18   minus X is what Officer Chafin would be responsible for.

19        MR. KILLMER:  So if I sue two people, and I settled

20   with one for the events -- for all of the events that

21   occurred before the second person even entered the

22   picture.

23        THE COURT:  That is not the case here.

24        MR. KILLMER:  Yes, it is.

25        THE COURT:  We are talking about Officer Chafin and

1    Mr. Burke.  That wasn't after the fact, it is the two of

2    them together.

3         MR. KILLMER:  Well, except the tort against

4    Mr. Burke included events that occurred before Chafin even

5    showed up.  Burke had an obligation to help Mr. White.  He

6    didn't help him.  In fact, he caused the problem.  We

7    settled our case against Burke for damages that he caused,

8    some of which are separable from the damages caused, as

9    well, by Chafin.

10        We settled for the pre-Chafin damages, and that is

11   what the settlement agreement says.  Chafin then comes in,

12   and there are more damages inflicted, namely the bloody

13   event where the head contusion occurs, and thereafter.

14        THE COURT:  And that is not part of the settlement.

15        MR. KILLMER:  That is not part of the settlement.

16        THE COURT:  I think the jury is entitled to know

17   that.

18        MR. KILLMER:  I don't think so, actually.

19        THE COURT:  I think they are.  If Officer Chafin is

20   going to be held solely responsible when he was not the

21   only actor there, then the jury ought to be able to take

22   that into consideration when they award damages.

23        MR. KILLMER:  I don't think that is the law.

24        THE COURT:  You haven't argued to me appropriately,

25   then, because that is how I look at it.  Joint and several

1    means not that he gets double, but that he gets

2    compensated for the whole amount, and each party is -- it

3    may be Officer Chafin that pays it fully, but he may not

4    get the full amount from Officer Chafin and Officer

5    Wyckoff.

6         MR. KILLMER:  We are not seeking double damages.

7         THE COURT:  You are asking me to separate this and

8    act like nothing happened with Daniel Burke, even though

9    he was part of the incident, and not tell the jury that.

10        MR. KILLMER:  The jury shouldn't know there is a

11   settlement.  That is the point of our motion in limine.

12        THE COURT:  So what do you respond to them when

13   they send out a question to me saying, why didn't they sue

14   Daniel Burke?

15        MR. KILLMER:  The proper response there is, you are

16   not to speculate as to why some parties are sued and other

17   parties are not.  They might say the same thing about

18   Greyhound.  They might say the same thing about Officer

19   Garcia.

20        THE COURT:  What happens when you put Daniel Burke

21   on the stand?

22        MR. KILLMER:  Well, what do you mean what happens?

23        THE COURT:  I assume -- are defendants calling

24   Daniel Burke?

25        MR. LYONS:  He is under our subpoena, as well as

1      the plaintiff's.

2           THE COURT:  What happens when he comes in?

3           MR. KILLMER:  I think the parties are instructed to

4      not elicit the fact that there has been a settlement.  I

5      don't think he spontaneously blurts it out because it is

6      required to be confidential.

7           THE COURT:  The rule prohibits the introduction of

8      settlement for purposes of showing liability.  It can be

9      used for a number of other purposes.  And I believe -- and

10     that is what I told you at the final trial prep -- that

11     the other purposes are appropriate.  I will not have you

12     re-argue this.

13          But essentially the shield against settlement is

14     usually asserted by the defendants.  And that is what this

15     instruction does, now as I read it, if you take out "the

16     settlement payment" and just put in "settlement," it is a

17     shield for defendants against plaintiff not to be able to

18     use the fact that there is settlement as proof of their

19     liability.  That is what the rule is about.

20          MR. KILLMER:  Sure.

21          THE COURT:  So I am not sure why it would be

22     objectionable to have the fact of the settlement come into

23     play here, especially when I know that will be the big

24     question in the minds of the jurors.

25          MR. KILLMER:  The jurors will then say, how much

 1      was it?

 2              THE COURT:  Yes.

 3              MR. KILLMER:  Does the Court plan on telling them?

 4      Because the cases we cited stand for the proposition that

 5      the deterrent effects of -- the deterrent purpose of

 6      Section 1983 will be eliminated if the remaining

 7      defendants that go to trial get a windfall from the

 8      defendants who decided that they better pony up early on

 9      and accept responsibility.

10              THE COURT:  None of those are from the Tenth

11      Circuit.

12              MR. KILLMER:  It is the United States Supreme

13      Court.

14              THE COURT:  But I don't think that is what those

15      cases actually -- I don't know that those cases preclude

16      them from knowing whether settlement came in.  I will have

17      to look at the cases again.

18              MR. KILLMER:  So I suppose it is currently still

19      under advisement?

20              THE COURT:  It is still under advisement.

21              MR. KILLMER:  We ought not talk about it in

22      opening?

23              THE COURT:  You ought not mention it in opening.

24              MR. KILLMER:  We will marshal the best cases and be

25      prepared when it comes up.

1            THE COURT:  All right.

2        MR. LYONS:  I am hopeful we won't need to deal with

3    this before we have testimony from Mr. White, but there

4    will be questions to Mr. White about what Mr. Burke did.

5            THE COURT:  That is perfectly legitimate.

6        MR. LYONS:  Then the other thing I would like to

7    ask the Court to consider is, I know you ruled earlier on

8    the motion in limine under -- as regards Exhibit 3.

9    Exhibit 3 is 4 pages, 3 pages of which I believe to be

10   something we have a collateral objection or an underlying

11   objection.

12           Respecting, now that we know that the Court is

13   going to allow some evidence with respect to the facts of

14   the dismissal of the charges against Mr. White by the

15   Denver Court following the fact that he had been charged

16   by Officer Chafin, and the District Attorney filed those

17   charges, the first 3 pages of Exhibit 3 happen to be, in

18   fact, evidence not of the fact that there was a dismissal

19   of those charges by the Court, but they are a motion that

20   was made by the District Attorney for the purpose of

21   attempting to have --

22           THE COURT:  Wait, I didn't rule on the exhibits

23   coming in, I ruled on the fact I think it is pertinent

24   that the case -- the charges against Mr. White were

25   dismissed.

1           MR. LYONS:  But I didn't want to have this argument

2      in front of the jury, Your Honor.  That is why I wanted to

3      raise it right now.

4           THE COURT:  I am not so sure the actual documents

5      are relevant.  The fact of the matter that that happened

6      is relevant.

7           MR. LYONS:  Which is what is Exhibit 3, the last

8      page, is the Certified Copy of the Order of the Court

9      dismissing charges.  And the defense does not object to

10     that particular exhibit on the collateral basis that we

11     previously stated.  We were attempting to keep it out.

12     The Court has already said we will not keep that out.

13          So that Order, itself, I am not trying to raise an

14     objection respecting that.  That is different than the

15     motion in limine exception that was already filed with the

16     Court and ruled upon.  What I am now concerned with is the

17     first 3 pages of Exhibit 3, which are the Motion, Proposed

18     Order, and Certificate of Service of the District

19     Attorney's Office.

20          And I have multiple bases upon which I believe that

21     should be excluded from the evidence in this case,

22     including the fact that the district attorney was doing

23     that while the City of Denver was still a party to this

24     lawsuit.  So, for some purposes, one could consider that

25     to have been something that should have been reflected as

1        a subsequent remedial measure, if nothing else, by the

2        City of Denver.

3                Furthermore, Your Honor, I think Rule 403 precludes

4        the introduction of this information, as it is misleading

5        in its heart, in the sense of knowing that the District

6        Attorney has made this decision on the basis that these

7        two gentlemen had no bases whatsoever or input whatsoever

8        with respect to it.  The District Attorney said, I can't

9        prove this case.  We don't know why.

10               THE COURT:  Let's back up.  I wasn't anticipating

11       documents being entered.  I was anticipating testimony

12       coming from probably Mr. White to the effect that the

13       charges against him were dismissed.  What is the

14       foundation for getting these into evidence?

15               MR. LYONS:  I don't know, Your Honor.  It is not my

16       exhibit and was not proposed by me.  I don't want it to be

17       in front of the jury and an issue to be raised in front of

18       the jury at that time.

19               My other objection is that this is hearsay within

20       hearsay under Federal Rules of Evidence 805 and 807.  And

21       I don't ask the Court to make any ruling right this

22       moment, but I don't want the record not to reflect our

23       objection to that part of the exhibit.

24               THE COURT:  All right.

25               MR. KILLMER:  I can provide the foundation if the

1    Court likes.

2         THE COURT:  What is the relevance of the first 3

3    pages, not just the Order?

4         MR. KILLMER:  The District Attorney made a

5    determination that there was no likelihood of securing --

6         THE COURT:  That was an individual lawyer.  So

7    what?  Another attorney could have made a different call.

8         MR. KILLMER:  This was an attorney on behalf of the

9    District Attorney's Office.  This is the People v. Philip

10   White.

11        THE COURT:  The same way I can make a ruling here

12   and Judge Jackson can make a ruling upstairs the opposite

13   way.  I don't think it is relevant.

14        MR. KILLMER:  It is admissible and relevant as far

15   as it goes.  It is not -- they can say, as a matter of

16   fact, the officers do take issue with it, and they do

17   argue it.  And one of them said he was very angry when he

18   heard the DA say, "We can't prove this case.  These are

19   not crimes."  It made him very upset at the DA.

20        This stuff is all judicially noticeable, because

21   these are official court filings, and --

22        THE COURT:  They are not.  They may be filings, but

23   they are not -- they have to be certified.  I will let you

24   know, I think the fact that the charges were dismissed is

25   relevant and should be admissible.  I do not believe all

1    of these filings that come from this are admissible.

2         I wasn't anticipating any exhibit.  I hadn't seen

3    that this was an exhibit.  At most, I would allow the

4    Order granting the motion.  I will not allow the first few

5    pages.

6         You can ask Mr. White if he knows why the charges

7    were dismissed, and he can testify to that.

8         MR. KILLMER:  Thank you.

9         THE COURT:  So I am excluding the exhibit, because

10   I think it will confuse the jury.  But I think you can

11   elicit that information from Mr. White.

12        Anything further?

13        MR. LYONS:  Those are my issues for this morning,

14   Your Honor.  Thank you very much.

15        THE COURT:  All right.  Anything from plaintiff?

16        MR. KILLMER:  No, Your Honor.

17        THE COURT:  Ms. Barnes, I am going to step out.

18   When you get them in, call me back.

19        (A break is taken from 8:32 a.m. to 8:54 a.m.)

20        (Voir dire contained in a sealed transcript.)

21        THE COURT:  All right.  You may be seated.  We are

22   going to take a break in a few minutes.  I need to read

23   one preliminary instruction now that you have been sworn

24   in as jurors, and then you can go to the bathroom, and

25   then Ms. Barnes will give you some additional information.

1           So, to ensure fairness, you must obey the following

2    rules:  One, do not talk to each other about this case or

3    about anyone involved with this case until the end of the

4    trial, when you go to the jury room to decide your

5    verdict.  This rule applies even when the Court is not in

6    session and when there is a recess in the trial.

7           Two, do not talk with anyone else about this case

8    or about anyone involved with this case until the trial

9    has ended and you have been discharged as jurors.  Anyone

10   else includes members of your family and your friends.

11   You can tell anyone who needs to know, such as family

12   members, employers, employees, teachers, et cetera, that

13   you are a juror in a case, and the Judge has ordered you

14   not to discuss the case until you have been discharged

15   from the case.

16          I will note a little aside.  When I served on my

17   jury trial, the first day after being selected, I went

18   home and my husband asked me, so what is the case about?

19   I said, I can't talk to you about it.  And he said, oh,

20   come on, I am your husband.  I said, no, the Judge told me

21   I couldn't talk about it.  So you will get some pressure

22   from significant others or friends, and tell them I told

23   you that you can't talk to anybody about it.

24          Three, outside the courtroom, do not let anyone

25   tell you anything about anyone involved with the case

1    until the trial has ended.  If somebody should try to talk

2    to you about the case before the trial ends, talk to

3    Ms. Barnes.

4         During the trial, you should not speak to any

5    parties, lawyers, or witness involved in this case.  You

6    should not even pass the time of day with any of them.  It

7    is important not only that you do justice in this case,

8    but that you also give the appearance of doing justice.

9         If any lawyer, party, or witness does not speak to

10   you when you pass in the hall, ride the elevator, or the

11   like, it is because they are not supposed to talk to you,

12   either.

13        Fifth, during the course of this trial, you will

14   receive all of the evidence you may legally consider to

15   decide the case.  Researching or gathering any information

16   on your own that you think might be helpful is against the

17   law and would be a violation of your oath.

18        Do not engage in any internet or other outside

19   reading or research in this case.  Do not consult

20   dictionaries, maps, or make any investigation about the

21   case, the lawyers, the parties, or the witnesses.

22        Now, I wish I did not have to dwell on this topic,

23   but in another case a couple years back, and because of

24   our recent technology, where you can get onto your phones,

25   Blackberries, iPhones, or the internet, it is so easy to

1   try to just go on and do some research.  So whether you

2   are in court or away from the Court during recesses, you

3   cannot Google, twitter, tweet, text message, blog, post,

4   or take any other action that has anything to do with this

5   case.

6          And if you do so, or get onto Google to do any

7   research, that could cause a mistrial.  A couple years ago

8   we had a mistrial after the case was concluded and had

9   been sent back to the jury for deliberations, and one of

10  the jurors there decided to violate the Court's order and

11  decided she didn't have enough information about the

12  location, and Googled some maps.  And the Court had to

13  declare a mistrial.

14         So, if you were to cause a mistrial by violating

15  this order, you could be subject to paying the cost of

16  these proceedings, and you could be punished for contempt

17  of court.  So it is a fairly serious matter.  Don't do

18  anything.  Listen to what is presented here, and when I

19  instruct you, you will deliberate.

20         Fairness to all concerned requires that all of us

21  connected with this case deal with the information, and

22  with nothing other than the same information produced in

23  this courtroom.

24         Six, do not decide during the trial what the

25  verdict should be.  Keep an open mind throughout the

1    trial, reaching your conclusion only after you have gone

2    to the jury room to decide the case, and you and your

3    fellow jurors have discussed all of the evidence.

4         Seven, if you need to tell me something, simply

5    give a note to Ms. Barnes, and she will give it to me.

6    With that being said, the most important thing is do not

7    discuss this with one another.

8         If you can follow Ms. Barnes out there, she will

9    show you where the jury deliberation room is.  You will

10   see the snacks.  There are restrooms and everything back

11   there.  She will give you key cards so you can make your

12   way back there.  When we recess for lunch, because today

13   you will be allowed to take a lunch because I didn't tell

14   you ahead of time you needed to bring one.

15        So we will take about a 20-minute recess so you

16   have time to get instructions and a restroom break.  And

17   we will come back and hear opening statements.

18        All right.  Nothing further, Court is in recess,

19   and the jury is excused for the time.

20        (A break is taken from 10:39 a.m. to 11:03 a.m.)

21        (The following is had in open court, outside the

22   hearing and presence of the jury.)

23        THE COURT:  You may be seated.

24        Any matters to bring to my attention before we

25   bring in the jury?

1          MR. KILLMER:  No, Your Honor.

2          THE COURT:  All right.  Ms. Barnes, would you

3     please bring in the jury.

4          (The following is had in open court, in the hearing

5     and presence of the jury.)

6          THE COURT:  All right.  You may be seated.

7          Welcome back, ladies and gentlemen.  I will read to

8     you a few more instructions, then we will move to the

9     opening statements.

10          We are about to begin the trial of the case you

11     heard about during jury selection.  Before the trial

12     begins, I am going to give you instructions that will help

13     you to understand what will be presented to you and how

14     you should conduct yourself during the trial.

15          During the trial, you will hear me use a few terms

16     that you may not have heard before.  Let me briefly

17     explain some of the most common to you.  The case we are

18     about to try is called a civil trial, as opposed to and

19     distinguished from a criminal trial.  In a civil case, the

20     party who is suing is referred to as plaintiff.  The

21     plaintiff in this case is Philip White.

22          The parties being sued are called defendants.  In

23     this action, the defendants are Robert Wyckoff and Kyllion

24     Chafin.

25          The following is a brief summary of the claims in

1    this case:  In this civil action, plaintiff, Mr. White,

2    asserts claims for relief against Defendant Officer Chafin

3    and Defendant Sergeant Wyckoff under 42 United States Code

4    Section 1983, a Civil Rights law passed by Congress that

5    provides a remedy to persons who have been deprived of

6    their Federal Constitutional rights.

7          Mr. White alleges that defendants used excessive

8    force during the course of his arrest on May 22, 2012, at

9    the Greyhound Bus Station, in violation of the Fourth

10   Amendment to the United States Constitution.

11         More specifically, Mr. White alleges that Officer

12   Chafin used excessive force in the course of his arrest,

13   and that Sergeant Wyckoff did not loosen or remove the

14   handcuffs after Mr. White complained that they were too

15   tight.  Mr. White seeks compensatory damages from both

16   defendants for injuries he claims to have sustained during

17   his arrest.

18         Officer Chafin and Sergeant Wyckoff deny that they

19   used excessive force during the arrest of Mr. White.

20   Officer Chafin alleges the force he used to arrest

21   Mr. White was reasonable under the circumstances given

22   Mr. White's demeanor and behavior.

23         Sergeant Wyckoff alleges that the handcuffs were

24   not too tight, and there was no reason to loosen the

25   handcuffs.  Defendants also submit their conduct was not

1    the proximate cause of Mr. White's alleged injuries and

2    damages.

3          You will sometimes hear me refer to "counsel."

4    Counsel is just another way of saying "lawyer" or

5    "attorney."  I will sometimes refer to myself as "the

6    Court."

7          During the trial, it may become necessary for me to

8    talk with the lawyers out of your hearing about questions

9    of law or procedure.  You heard some of that during the

10   voir dire.  Sometimes you may be excused from the

11   courtroom during these discussions.  I will try to limit

12   these interruptions as much as possible, but you should

13   remember the importance of the matter you are here to

14   determine, and you should be patient, even though the case

15   may seem to go slowly.

16         From time to time during the trial, I may make

17   rulings on objections made by the lawyers.  It is the duty

18   of the lawyer on each side of the case to object when the

19   other side offers testimony or an exhibit that the lawyer

20   believes is not properly admissible under the rules of

21   law.

22         Only by making an objection can a lawyer request

23   and obtain a ruling from me on the admissibility of the

24   evidence being offered by the other side.  You should not

25   be influenced against any lawyer or the lawyer's client

1    because the lawyer has made objections.

2          When I overrule an objection, that means I am

3    permitting the evidence to be admitted.  When I sustain an

4    objection, that means I am excluding that evidence from

5    the trial for a good reason.  If I sustain an objection to

6    a question, then the witness cannot answer the question,

7    and you should not draw any inferences or conclusions from

8    the question.  If the witness has already answered a

9    question to which I sustain an objection, and I order that

10   the testimony is stricken, you must entirely ignore that

11   testimony.

12         Some evidence is admitted for limited purposes

13   only.  When I instruct you that an item of evidence has

14   been admitted for a limited purpose, you must consider it

15   only for that limited purpose and for no other purpose.

16   When I say "admitted into evidence," or "received into

17   evidence," I mean this particular statement or the

18   particular exhibit may be considered by you in making the

19   decisions you must make at the end of the case.

20         Do not attempt to interpret my rulings on

21   objections as somehow indicating how I think you should

22   decide the case.  I am simply making a ruling on a legal

23   question.  You should not infer or conclude from any

24   ruling or other comment I may make that I have opinions on

25   the merits of the case favoring one side or the other.  I

1    do not favor one side or the other.

2          As I have already told you, and I will continue to

3    remind you every time we take a break, while the trial is

4    in progress, you must not discuss the case in any manner

5    among yourselves or with anyone else.  In addition, you

6    should not permit anyone to discuss the case in your

7    presence.

8          You should avoid reading any news articles that

9    might be published about the case, and avoid watching or

10   listening to any television or radio comments about the

11   trial.

12         The trial lawyers and the parties are not allowed

13   to speak with you during this case.  When you see them at

14   a recess or pass them in the hall and they do not speak to

15   you, they are not being rude or unfriendly, they are

16   simply following the law.

17         Remember at all times that you, as jurors, are the

18   sole judges of the facts in this case.  It is your

19   recollection and evaluation of the evidence that is

20   important to the verdict in this case.  By your verdict,

21   you will decide disputed issues of fact.  I will decide

22   all issues of law that arise during the trial.

23         Before you begin your deliberations at the close of

24   the case, I will instruct you in more detail on the law

25   that you must follow and apply.  Because you will be asked

1   to decide the facts of this case, you should give careful

2   attention to the testimony and evidence presented.  Keep

3   in mind that I will instruct you about determining the

4   credibility or believability of witnesses.

5          During the trial you should keep an open mind and

6   should not form or express any opinion about this case

7   until you have heard all of the testimony and evidence,

8   the lawyers' closing arguments, and my instructions to you

9   on the law.

10          The evidence in this case will consist of the

11   following:  The sworn testimony of witnesses on both

12   direct and cross-examination, no matter who calls the

13   witness.  All exhibits received in evidence, regardless of

14   who may have produced the exhibits.  All facts that may

15   have been judicially noticed and that you must take as

16   true for purposes of the case.

17          Depositions may also be received in evidence.

18   Depositions contain sworn testimony; the lawyers for each

19   party being entitled to ask questions.  In some cases a

20   deposition may be played for you on videotape, which I

21   don't think we have in this case.

22          Deposition testimony should be judged by you

23   subject to the same instructions that apply to witnesses

24   testifying in open court.

25          In deciding the facts, you may have to decide which

1   testimony to believe and which testimony not to believe.

2   You may believe everything a witness says, part of it, or

3   none of it.

4        In considering the testimony of any witness, you

5   may take into account many factors, including the witness'

6   opportunity and ability to see, hear, or know the things

7   the witness testified about; the quality of the witness'

8   memory; the witness' appearance and manner while

9   testifying; the witness' interest in the outcome of the

10  case; any bias or prejudice the witness may have; other

11  evidence that may have contradicted the witness'

12  testimony; and the reasonableness of the witness'

13  testimony in light of all of the evidence.

14       Statements and arguments of the lawyers are not

15  evidence in the case unless made as an admission or a

16  stipulation of fact.  A stipulation is an agreement

17  between both sides that certain facts are true or that a

18  person would have given certain testimony.

19       When the lawyers on both sides stipulate or agree

20  to the existence of a fact, you must, unless otherwise

21  instructed, accept the stipulation as evidence and regard

22  that fact as proved.

23       You are to consider only the evidence in the case,

24  but in your consideration of the evidence, you are not

25  limited to the statements of the witnesses.  In other

1    words, you are not limited solely to what you see and hear

2    as the witnesses testify.  You may draw from the facts

3    that you find have been proved such reasonable inferences

4    or conclusions as you feel are justified in light of your

5    experience and common sense.

6         At the end of the trial, you will have to make your

7    decision based on what you recall of the evidence.  You

8    will not have a written transcript to consult.  And it is

9    difficult and time consuming for the reporter to read back

10   lengthy testimony, and I don't allow it anyway.  Even

11   though she is taking notes, you will not be allowed to

12   have certain testimony read back.  So I urge you to pay

13   close attention to the testimony as it is given.

14        If you want to take notes during the trial, you

15   may, but be sure that your note taking does not interfere

16   with listening to and considering all of the evidence.

17        If you choose not to take notes, remember, it is

18   your own individual responsibility to listen carefully to

19   the evidence.  Notes you take during the trial are not

20   necessarily more reliable than your memory or another

21   juror's memory.  Therefore, you should not be overly

22   influenced by the notes.

23        If you do take notes, do not discuss them with

24   anyone before you begin your deliberations.  At the end of

25   each day, please leave your notes in the jury deliberation

1      room, and we lock that room so no one will see them.  And

2      at the end of the trial, you may take your notes out of

3      the notebook and keep them, or just leave them and we will

4      destroy them.  No one will read the notes either during or

5      after the trial.

6            The case will proceed as follows:  First, the

7      lawyers for each side may make opening statements.  What

8      is said in the opening statements is not evidence, but is

9      simply an outline to help you understand what each party

10     expects the evidence to show.

11           After the opening statements, plaintiff may present

12     evidence in support of plaintiff's claims, and defendant's

13     lawyers may cross-examine witnesses.

14           At the conclusion of plaintiff's case, defendants

15     may introduce evidence, and plaintiff's lawyers may

16     cross-examine witnesses.  If defendant introduces

17     evidence, plaintiff may then present rebuttal evidence.

18           After the evidence is presented, the parties'

19     lawyers make closing arguments explaining what they

20     believe the evidence has shown.  What is said in the

21     closing arguments is not evidence.

22           After all of the evidence has been heard and the

23     arguments and instructions are finished, you will need to

24     make your decision.  You will determine the facts from all

25     of the testimony and other evidence that is presented.

1          Although you must follow my instructions about the

2     law applicable to this case, you, as jurors, are the sole

3     and exclusive judges of the facts.  Neither in these

4     instructions nor in any ruling, action, or remark I may

5     make during the course of this trial, will it be my

6     intention to give any opinion or suggestion as to what

7     your verdict should be.

8          Stipulated facts.  The parties have stipulated to

9     certain facts and agree that these facts can be taken as

10    true without further proof.  The stipulated facts are as

11    follows.  You will get a copy of these at the end of the

12    trial, so you don't have to write them all down, just

13    listen to them at this point.

14         One, Plaintiff Philip White, at all times relevant

15    to the subject matter of this litigation, was a citizen of

16    the United States and a resident of and domiciled in the

17    State of Colorado.

18         Two, at the time of the incident, Defendant Robert

19    Wyckoff was acting under color of state law in his

20    capacity as a law enforcement officer with the Denver

21    Police Department.

22         Three, at the time of the incident, Defendant

23    Kyllion Chafin was acting under color of state law in his

24    capacity as a law enforcement officer with the Denver

25    Police Department.

1          Four, on May 22, 2012, Philip White went to

2    Greyhound Bus Terminal, located at 1055 19th Street, in

3    Denver, Colorado.

4          Five, Philip White was informed by Greyhound staff

5    that there was no seats available for the 12:15 bus to

6    Vail, Colorado.

7          Six, Officer Chafin was dispatched to the Greyhound

8    Bus Terminal.

9          Because the parties have stipulated to these facts

10   and do not dispute them, you are to take these facts as

11   true for purposes of this case.

12         And, with that being said, I think we are prepared

13   to move to opening statements.  And, remember, they are

14   statements, not argument.

15         All right.  Ms. Newman, you may proceed.

16         MS. NEWMAN:  Thank you, Your Honor.

17                    **OPENING STATEMENT**

18   **BY MS. NEWMAN:**

19         I was trying to go home.  I followed all of the

20   rules.  I would take any help that I could get.  This is

21   one of the worst things that has ever happened to me

22   outside of losing my eyesight, and that was an accident.

23         How did this happen to Philip White, the events

24   that bring us here today?

25         Your Honor I was hoping to use some demonstrative

1    exhibits during the course of this, which I have already

2    cleared with opposing counsel

3         THE COURT:  If we can turn on the monitors.  Ladies

4    and gentlemen, if you push your monitors forward so you

5    can see.

6         MS. NEWMAN:  Thank you.

7         How did this man, Philip White, a 77-year-old man,

8    a law-abiding citizen, who had never once in his entire

9    life had any contact with the police, who was following

10   all of the rules, just trying to get a ticket on a bus to

11   go home, how did he end up handcuffed -- on the ground,

12   handcuffed, with cuffs so tight that they damaged his

13   nerves, with blood streaming down his face, and a head

14   injury, sitting on the ground, with officers joking,

15   joking at his expense, humiliated and degraded?  How did

16   this happen?

17        Throughout the course of the week, you will learn a

18   lot about Mr. White.  You will learn that he is a pretty

19   extraordinary man.  He has overcome some pretty

20   extraordinary hurdles in his life.  As you can see, he is

21   totally blind.

22        He grew up in Flint, Michigan, the son of an auto

23   mechanic and homemaker.  He lost his eyesight as a child.

24   You will learn that he was about 11 years old, playing

25   with some friends, throwing snowballs, and he lost his

1   eyesight when an ice ball hit one of his eyes, and he lost

2   his right eye.  You will hear his right eye is a glass eye

3   that comes out.

4          Over the course of time, he lost sight altogether

5   in his left eye.  And during the time of this incident, he

6   could barely, maybe see light and dark, if that.  He is

7   entirely blind today, and may have been able to only see

8   dark and light back at the time of these incidents in May

9   of 2012 which you will hear a whole lot about.

10         You will hear that even though he had these

11  challenges as a blind child and blind man, he went on to

12  serve his community as a public school teacher and as a

13  school administrator for 33 years.  He got married.  He

14  had two beautiful sons; Stephen and Christopher.  Stephen,

15  who is his older son, is actually here today, sitting in

16  the audience, here to support his dad.

17         His two sons have been his support and his

18  lifeline.  But he has really gone far, and he has done

19  well.  His son, Stephen, moved to Colorado in the '80s.

20  And Philip came to visit him with his younger son,

21  Christopher.  They hiked a fourteener, Grays, with

22  Christopher, his young son, and a friend.

23         And, eventually, Mr. White decided to move to

24  Colorado, himself, to be closer to his son.  And he was

25  even blessed with a grandchild.  He is pictured here -- I

1    am ahead of the slide.  He is pictured at a Rockies' game,

2    along with his son, Stephen, and Stephen's father-in-law.

3    He is a Coloradan now.  He has a young grandson, who is

4    now just about 5 years old.  This picture was taken about

5    5 years ago, you will learn.

6         How did he end up here?  You will learn that on May

7    22, 2012, Mr. White had come to Denver to attend a

8    conference.  It was a conference where St. Joseph

9    Hospital, they were going to be demonstrating all types of

10   exciting new technology for a blind person.  That is

11   something of particular interest to Mr. White, for obvious

12   reasons.

13        In addition to the fact that he is blind himself,

14   he actually served quite a few years as a teacher for the

15   blind and as a teacher for kids with disabilities.  So

16   this is something that is special to him and important to

17   him.

18        So he came to Denver.  He lives in Eagle, Colorado,

19   outside of Vail.  He came to Denver on a Greyhound bus,

20   and planned to go back on a Greyhound bus.  He had planned

21   to go back on Greyhound, and he arranged in advance for a

22   paratransit bus to take him from Vail to Eagle, a little

23   bit away from Vail, where he lives.

24        Now, he has taken the bus his entire life.  You can

25   imagine, as a blind man, he is a little limited.  So he

1  doesn't drive.  He has been taking the bus his whole life,

2  and had taken the Greyhound bus more than he can count.

3  He knows the rules of the Greyhound bus.

4         The rules are that you have to get there at least

5  an hour in advance.  Once you get there, there is no

6  guarantee there will be a ticket.  In fact, there is a not

7  a guarantee you will get a seat, even if you bought a

8  ticket in advance.  In any case, you are supposed to get

9  there an hour in advance, and he did that.

10        He knows the rules.  Sometimes, when the buses are

11  sold out, Greyhound will bring in an extra bus when there

12  are routes that require that.  So he has done this before,

13  and he planned to do it again on this occasion.

14        So, on the 22nd of May, he went to the Greyhound

15  bus station hoping to get a bus.  He had a big old

16  suitcase with him, a suitcase on wheels, but a big old

17  suitcase.  As you will see, Mr. White gets around with a

18  cane.  He has it sitting on the ground, but it is just a

19  touch over 5 feet tall, nearly as tall as he is.  But it

20  is a big white cane, which you will see during the course

21  of the trial, I am sure.

22        He gets to the Greyhound Bus Station.  He is met as

23  soon as he walks in the door by a security guard, who

24  helps him find the ticket counter.  So he gets up to the

25  ticket counter and asks the woman, he is trying to buy

1   this ticket for the bus to get back to Vail.  The bus is

2   at 12:15.

3         What he learns when he gets to the ticket counter

4   is that the bus is sold out.  All right.  No huge problem,

5   this has happened to him before.  And when it happened to

6   him before, he talked to the ticket salesperson about what

7   he could do, and on that instance, what happened was the

8   ticket seller said, "I have a great idea.  We can arrange

9   for you to stay at the hotel where all of the bus drivers

10  stay.  Obviously, you will have to pay for your own room,

11  but I can call and see if there is a room there, because

12  that hotel provides transportation, and you wouldn't have

13  to worry about it.  Let's see, I need to clear it with the

14  monger."

15        All right.  That sounds like a fine idea.  So

16  Philip White agrees to that.  Great, he has

17  transportation, he will stay in Denver an extra day, do

18  banking.  His bank doesn't have a branch in Eagle.  This

19  turns out to be a perfect resolution.

20        There is a second time, you will learn, when

21  Mr. White went to the Greyhound Station and his bus was

22  sold out.  On that occasion, he talked to the manager

23  again, and the manager checked to see if he could stay at

24  the hotel.  He couldn't stay at the hotel, it was sold

25  out.  All right, things happen.

1          So on this occasion, he asked the ticket manager,

2   all right, well, it is sold out -- I am sorry, the ticket

3   salesperson, what are my options?  She gives him two

4   options.  The first option is, you are here pretty early.

5   In fact, he was there way more than an hour early.  So you

6   can wait until the bus comes at 12:15, and see if maybe

7   somebody doesn't show up, and you can take their seat.

8   Or, there is another bus later tonight, which leaves

9   around 8:00.  You can wait in the bus station until that

10  one comes and have a seat on that one.

11          The first option sounded pretty good, because maybe

12  there would be a seat on the bus, or maybe they would even

13  bring another bus.  The second option, Philip wasn't so

14  enthused about that one, since he had arranged for a

15  paratransit ride.  That would get him to Vail, but not in

16  time to get his next bus.  So he wasn't thrilled about

17  that option.

18          He asked to speak to the manger, like the prior two

19  occasions when the Greyhound bus was full.  The manager

20  gave him the exact same two options.  You can wait until

21  the 12:15 bus comes, see if there is a spot, or try to

22  catch the later bus.

23          Mr. White is in the middle of this conversation

24  with the manager and thinks she is about to give a third

25  option, when there is some kind of a noise.  He doesn't

1    hear what she says.  So he is waiting for the third

2    option, and he doesn't hear it.  And at this point,

3    something happens, which Mr. White just does not

4    understand to this day.  He we will probably never

5    understand.

6         This is the point where the security guard,

7    Mr. Burke, who you will hear from during the course of the

8    week, says to Mr. White, "You are trespassing.  You need

9    to leave."  Mr. White is totally confused by this, because

10   he heard from not one, but two different Greyhound

11   employees that he has two options, that both involve him

12   staying at the station and waiting to see if he can get a

13   bus.

14        So he is trying he to figure out, I don't

15   understand this.  Why would I be required to leave?  How

16   could I be trespassing if I have been told I can stay?  So

17   he is trying to get some clarification from the security

18   guard, but the security guard says, "No, you are

19   trespassing, and I will call the police."

20        Philip thinks actually that is a fine idea.  He has

21   never had any bad experience whatsoever with the police.

22   In fact, he has only had good experiences with the police.

23   His father was friends with some police officers as he was

24   growing up.  There was a police officer that went to the

25   church he attended when he was growing up, so he is

1    thinking, all right, that seems like a good idea.

2         So he actually gets his own phone and calls 911,

3    because he wants to know, if I am doing something wrong, I

4    want to know.  But I can't understand what is happening

5    here.  So he calls up 911.

6         What you will learn is simultaneously, the security

7    officer is calling the police, and Mr. White is calling

8    911.  Mr. White talks to the 911 dispatcher for quite some

9    time.  And he is a little wordy.  He has a lot to say.

10   And I think it is fair to say, he talks your ear off.

11        But he is talking to the 911 dispatcher.  And

12   people are coming and going, buying tickets, going places,

13   whatever, as he is having this conversation with the

14   dispatcher.  And then Mr. Burke is having a separate

15   conversation with somebody.

16        Then somebody comes in.  It turns out to be Officer

17   Chafin.  He identifies himself as a police officer.  This

18   is when things go south.  Mr. White says to the woman on

19   the phone, the dispatcher, "Did you send somebody down

20   here?"  "No, we didn't.  We haven't sent somebody."  So he

21   is trying to figure out, is this man really a police

22   officer?

23        Weirdly, you will hear Mr. White has had one past

24   experience, which has really formed his thinking,

25   ironically, in a Greyhound Station in Michigan.  He was

1   once told by some man, who was posing as a police officer,

2   that he needed to leave this public area. And then this

3   guy, who said he was a police officer, brought him to some

4   secluded area and tried to rob him.

5        So this is something that Philip White has carried

6   around with him. He thought to himself, I will not let

7   this happen again. This is the kind of thing that sighted

8   people don't think about. When this mans comes up to

9   Mr. White and says, I am a police officer, Mr. White says,

10  "I need to verify." He asks dispatch, "Did you send

11  somebody?" She says, "No I didn't."

12       He says to the man, who identified himself, "let me

13  feel your badge," because he can't see, but he can use his

14  hands as his eyes. "Let me feel your badge." For reasons

15  known only to him, Officer Chafin says, "No, you can't

16  feel my badge."

17       You will hear Mr. White became frustrated. And he

18  is embarrassed about this. He used a word he doesn't use.

19  He said, "Let me feel your badge, goddamn it." He doesn't

20  take the Lord's name in vain. He is embarrassed about it,

21  but he was frustrated. He was scared.

22       And Officer Chafin, for whatever reason, did not

23  want to let him feel his badge. This made Mr. White even

24  more suspicious. The woman on the 911 dispatch emergency

25  call said she hadn't sent somebody. This man won't let

1    him feel a badge.  Why not?

2          And then Officer Chafin says, "Hang up your phone,"

3    and is insisting Mr. White hang up his phone.  Now,

4    Mr. White, if he knew it was a police officer, would do

5    it, but he is trying to figure out, who is this guy?  Why

6    is he making me do these things?  So he is trying to

7    figure it out.  But what he has on the phone is his

8    lifeline to 911; the police that he called.

9          He knows that 911 is the real police, because he

10   has called them himself.  He doesn't know who this guy is,

11   but he is thinking this situation doesn't make a bit of

12   sense to me.  I am told by the Greyhound employees I can

13   stay.  I am told by the security officer I am trespassing.

14   Now there is this guy, I don't know who he is.

15         But here is what is really interesting.  The amount

16   of time that elapses between when Officer Chafin comes in

17   and identifies himself as a police officer and when he

18   threatens to arrest Mr. White is a total -- a total of 27

19   seconds.  Within 27 seconds of telling Mr. White he is a

20   police officer, he is already saying, "I am going to

21   arrest you."

22         And then he goes about it.  You don't have to take

23   my word for this, there is a video, which we will show

24   you.  I want you to notice as we are watching the video

25   the amount of time it takes.  At 1850 in the video -- this

1    shows up on your screens.  1850.  There is a minute

2    counter along the bottom.

3         At 1850, Officer Chafin comes up to Mr. White and

4    says, "I am a police officer."  Mr. White is trying to

5    verify that.  24 seconds later, at 1914, Officer Chafin

6    says, "I will go ahead and arrest you."  Twenty-four

7    seconds.  He hasn't had an opportunity to say, sir, can I

8    help you?  Sir, what seems to be the problem?  What is

9    going on here?  None of that.

10        And then, within less than 2-and-a-half minutes, 2

11   minutes and 17 seconds after he first identifies himself

12   to Mr. White, he goes hands on; he uses force against

13   Mr. White.  What you will hear is he takes Mr. White by

14   the arm, wrenches his arm up so high that Mr. White is

15   afraid his shoulder will pop out of the socket.

16        You will see, Mr. White is not a big man; 5 foot 4.

17   And, actually, now that I am wearing these heels, I am

18   taller than he is.  So he is not a big man.  When Officer

19   Chafin lifts up his arm, he is wrenching it up high.  The

20   next thing you hear on the video is, "oww, let go of my

21   arm."

22        Then there is a scuffle that ensues.  What you hear

23   is then Officer Chafin.  And you will get to see this, as

24   well.  Officer Chafin takes him by one arm.  The security

25   guard takes him by the other arm.  The two of them

1    together cuff Mr. White, and slam his head down into the

2    counter, leading to that contusion you saw in the picture;

3    the blood streaming down his face.

4         Then they take him outside.  And that is the end of

5    that video.  I will play you the video, and the video --

6    we will watch it together.  We will fast forward through

7    the first little bit.  You can see what is happening

8    during this part, before anything is going on, is people

9    are coming and going, buying tickets.

10        In the bottom left-hand corner -- stop for just a

11   minute so we can show where Mr. White is.  Can you point

12   to him with the little hand that comes on the computer

13   screen?  Mr. White is that little man with the white hair,

14   bottom left-hand corner.  The security guard, Mr. Burke,

15   is there in the yellow.

16        So you can see this is a video taken from behind

17   the counter where they are selling tickets.  So even

18   though the two of them are talking, people are coming and

19   going, buying tickets.  It is not creating any sort of

20   disturbance that is stopping business.  People are just

21   going about their business.

22        Now you see here, both Mr. White and Mr. Burke on

23   the telephone at this point.  Shortly, you will be able to

24   hear the 911 call and see what happens.  But I want you to

25   focus on the time when Mr. Burke goes out and gets the

1    police officer and they come back, and the time of -- just

2    how short it is before Officer Chafin both threatens to

3    arrest Mr. White and then goes hands on and does it.

4              (Tape recording played in open court.)

5              MS. NEWMAN:  The security guard is going towards

6    the police officer now.

7              (Tape recording played in open court.)

8              MS. NEWMAN:  So, as you will continue to hear

9    throughout the trial, within 2 minutes and 17 seconds of

10   confronting this elderly blind man, who is 5 foot 4, 140

11   pounds, obviously confused about what is going on and who

12   he is interacting with, and just as the dispatcher is

13   saying, "SOUNDS like an officer.  You better listen to

14   him," "okay, you are the officer."  And the first thing

15   you hear after that is, "let go of my arm.  Let go of my

16   cane."

17             You will learn the next thing that happens is they

18   take Mr. White outside.  Another officer comes, and they

19   take Mr. White outside, where they put him down on the

20   ground, outside, sitting there bleeding, in handcuffs,

21   handcuffs that are excruciatingly tight.  Handcuffs that

22   are cutting off the feeling in his hands.

23             And our hands are important.  But Mr. White will

24   tell you that his hands are critical to him.  Because he

25   doesn't have eyesight, he has to rely on his other senses.

1    And what he will tell you is his ability to walk with his

2    cane, his ability to read -- he is an avid reader.  His

3    ability to read Braille, all of these things require his

4    hands.

5         And he is sitting on the ground, in these handcuffs

6    that are too tight.  He will tell you that as he is

7    sitting there, he hears more officers arriving.  Sergeant

8    Wyckoff arrives.  At this point, he will tell you he hears

9    these officers coming and joking now "it is time to get

10   tough on him."  They are laughing.  Laughing at his

11   expense, as he is sitting there on the ground bleeding, in

12   these cuffs that are too tight.

13        I want to talk to you for a minute about handcuffs.

14   Handcuffs are designed -- these, in fact, are the

15   handcuffs, we are told, that Officer Chafin used.  They

16   are heavy, and they are designed to tighten easily.  They

17   are designed to tighten easily.  But they don't loosen

18   unless the officer takes an affirmative step to put the

19   key in there and open them up and loosen them.  But they

20   tighten easily, and they hurt.

21        Now, nobody is arguing that handcuffs are supposed

22   to be comfortable.  But, if they are too tight, they can

23   injure a person, and they did injure Mr. White.  And while

24   he is sitting there in these handcuffs, too tight,

25   Lieutenant Wyckoff comes up.

1        What does he do?  He doesn't respond to Mr. White's

2   pleas to loosen the handcuffs because he is losing feeling

3   and his hand is numb.  He doesn't respond to that, but

4   what does he do?  He secretly takes a video, interrogating

5   Mr. White, to try to gain a confession to use to support

6   criminal charges against him for trespassing.

7        So, without ever even telling Mr. White he is doing

8   it, he gets out his cell phone and takes a videotape of

9   Mr. White.  You will hear a few things on that videotape

10  which are pretty critical.  The first thing you hear in

11  that videotape is Mr. White saying, "my hands are numb."

12       There is a paramedic working on him.  Mr. White

13  doesn't know what is going on.  The paramedic who is

14  working on him identifies himself.  Mr. White says, "why

15  can't somebody do something about my hands?"

16       But Sergeant Wyckoff is totally calloused to that.

17  What he wants to do is get this confession.  So he takes

18  this videotape.  And what you hear is Mr. White trying to

19  explain what happened, trying to explain his side of the

20  story.  But Sergeant Wyckoff doesn't say, sir, what

21  happened?  Sir, what is going on here?  Sir, how can we

22  help you?

23       He continues with the interrogation.  And you hear

24  what is really, I think, the most honest thing in this

25  whole trial, Mr. White's just spontaneous statement, not

1  even knowing he is being videotaped, "this is one of the

2  worst things that has ever happened to me outside of

3  losing my eyesight, and that was an accident."

4          I want to play for you the video.

5          (Videotape played in open court.)

6          MS. NEWMAN:  It is not okay.  And it wasn't okay.

7  You will see that nobody ever let Mr. White explain his

8  side of the story.  Nobody ever asked him, what is wrong

9  sir?  How can we help you?  But the indignities that

10  Mr. White had to suffer because of the course of action

11  that these two officers took, didn't end there.

12          He was then pushed and pulled into a police car.

13  Of course he didn't have his cane, his hands were still

14  cuffed too tight behind his back.  He was eventually put

15  into a police car.  Another officer came and eventually

16  put on different handcuffs, but his handcuffs continued to

17  hurt.  He was put into a police car.  He was taken to two

18  different jails.

19          And, as you will learn, at one of the jails he was

20  required to take out his eye.  I don't know why.  He was

21  shackled to a bench for several hours.  He was afraid to

22  go to the bathroom because he thought he might miss the

23  toilet and then get in trouble.

24          He was eventually taken to another jail, the jail

25  that is on Colfax for those of you who know Denver.  And,

1    finally, after midnight, Mr. White, a 77-year-old blind

2    man, was released out of the jail, on Colfax, at about

3    1:00 in the morning, all by himself.

4            And that still wasn't the end of it.  The

5    defendants, the officers, Officer Chafin and Officer

6    Wyckoff, caused criminal charges to be filed against him,

7    charges for trespassing, disturbing the peace, and

8    resisting.  But just because they say he was breaking the

9    law does not make it so.

10           You will learn, and the evidence will show those

11   charges were all dismissed at the initiative of the

12   prosecutor, and the judge issued an order dismissing all

13   charges against Mr. White.  He has still never been

14   convicted of any crime, and never even ended up going

15   through the Court process.  It was dismissed immediately.

16   But the damage was done.

17           These officers, through the excessive force that

18   they used, through excessive force that they used

19   recklessly, callously, with reckless indifference to

20   Mr. White's federally-protected constitutional rights,

21   damaged him, and damaged him severely.

22           Now, some of those damages are easy to see.  It is

23   easy enough to see the injury to Mr. White's head on the

24   outside.  It is easy enough to see the blood streaming

25   down his face.  And that is just one kind of damage caused

1    when Officer Chafin, along with the security guard,

2    slammed his head down, slammed his head into the counter

3    while they had him cuffed.

4         You will hear later from both Mr. White and from

5    his own treating physician, his own primary care doctor,

6    about the damages related to that, but also about the

7    other physical damages; nerve damage because of these

8    handcuffs that were too tight.  Those are the physical

9    damages.

10        But, you know, that is just really one kind of

11   damage that you will learn about.  The other thing that

12   you will learn is that Mr. White is a person that for his

13   entire life trusted the police.  And Mr. White, as much as

14   he doesn't like to admit, is vulnerable.

15        He will tell you it is difficult to get around.  He

16   has to rely on strangers to help him.  He has to rely and

17   trust people, because he really can't see.  And you will

18   learn that he needs to have some sort of security net.

19        And the idea that he can call 911 and call the

20   police if something is happening that he doesn't

21   understand, or something is happening that puts him in

22   danger, he needs to be able to have some kind of ability

23   to travel in the world, to have somebody who will, in

24   fact, serve and protect, like he always, for his entire

25   life, up until this point, thought the police would do for

1    him.  And this has been a very serious change for

2    Mr. White, and you will hear about it from him.

3          He doesn't travel like he used to.  He doesn't feel

4    comfortable in the world like he used to.  He doesn't feel

5    safe.  There are places where he can't go any more.  This

6    incident stripped him of his dignity.  He was sitting

7    there with these handcuffs too tight, calling out for

8    help, blood coming down his face, and nobody would help

9    him.  Please help this man get back his dignity.

10         THE COURT:  All right.  Mr. Lyons?

11         MR. LYONS:  Thank you, Your Honor.

12                      **OPENING STATEMENT**

13   **BY MR. LYONS:**

14         My name is Tom Lyons, and I represent the police

15   officers in this case.  We need to correct a little bit of

16   information you have already received.  One thing about

17   this case is that you know this is the case of the

18   indisputable video evidence.  You already saw the videos.

19   If that was the issue in relation to this case, we

20   wouldn't be here, and you wouldn't be asked to figure out

21   what are the facts associated with these circumstances;

22   right?

23         Can you imagine why we would want to be here if

24   there weren't other facts?  Of course not.  There are

25   plenty of other facts.  One of the most important ones

1    that I think we need to recognize about this situation is,

2    of course, that when we had Mr. White in the bus station,

3    he wasn't the only person who was there.  There were other

4    persons there.  One of them is Mr. Burke.

5        You will hear from him.  He was the security guard

6    who was involved in this process from the time that

7    Mr. White came to the front door, and who was there

8    listening to what Mr. White was doing, and made sure that

9    he got to the ticket counter, made sure he got him to the

10   manager.

11       You will hear from the manager.  Her name is Terri

12   Allen, who will relay to you how it was she interacted

13   with Mr. White while he was in the bus station that day.

14   And, in addition to that, you will hear what happened when

15   Mr. White and Mr. Burke were engaged in the duelling 911

16   calls.

17       You already heard about how Mr. White talked to the

18   dispatcher.  And in the course you will have information

19   from Mr. Burke about what he was telling the dispatcher,

20   and so forth.

21       Furthermore, you didn't hear anything from

22   Ms. Newman about what Officer Chafin has to say.  I know

23   you can see him.  I know you can hear some share of what

24   happened, because the telephone did pick up some things

25   that he said.  But you haven't heard all of what he had to

1     say, and I don't think there is too much to doubt about

2     the idea that between the time that Officer Chafin arrives

3     and the time that Mr. White is subdued, that there had

4     been a very short interval of time.

5          But you also need to take account of what did

6     Mr. White have to say?  And you could hear some of that,

7     but you didn't hear all of it.  You didn't hear all of it

8     from Mr. Burke or Officer Chafin, both who were on the

9     scene.  As a result of all of this notion that there is

10    this indisputable video evidence, what I hope you can

11    recognize is those other people have some contributions to

12    make to what happened here, as well as does Mr. White.

13         Furthermore, what you can't tell on that video is

14    altogether what happened when it passes out of the frame.

15    Now, I will not ask you to play the New York judge for the

16    referees who have to look at the TV set and figure out

17    what happened from a thousand miles away during the

18    football game.  But I think you need to understand that

19    there is some share of what is there that you can't see.

20    So we will have to have you look at this again a little

21    bit.

22         Further, I am sure you will have the opportunity

23    from the Court to take the video, which we've agreed is an

24    indisputable part of the evidence in this case, with you

25    to deliberate in association with these circumstances.

1            In addition to that, you didn't hear the name from

2      Ms. Newman of Sergeant Garcia.  By the way, I am sorry I

3      didn't mention this earlier.  We have Robert Wyckoff here

4      today.  You heard him referenced by the Court as Sergeant,

5      which he was at the time.  He is now a Lieutenant.  And

6      Ms. Newman correctly identified him as such.

7            In fact, Kristy Garcia, who is also a part of this

8      scenario, who is now a sergeant, was an officer who was on

9      the scene.  And, actually, if you look at the video when

10     you go through it yourselves, you will see Officer Garcia

11     gets there after Mr. White is in handcuffs, and she helps

12     Officer Chafin take Mr. White out of the bus station.

13           Another thing I think you will see in this case is

14     the bus station.  It is important for me, in my mind, at

15     least, for you to understand that location, because you

16     will get the orientation that you can't get from that

17     video.  The first time I watched the video, I wasn't sure

18     where I was or what was going on.

19           I understand we will have the opportunity for the

20     Court to escort you to the bus station, which happens to

21     be across the street.  So you will get a chance to see the

22     actual environment where these events took place.  Near as

23     I could tell from my own visit there, it is the same kind

24     of situation, but that is up for you to decide when you

25     get over there.

1           Once we get to the point of looking at the issues

2     of what happened amongst Mr. Burke; Ms. Allen, the bus

3     station manager; Officer Chafin, then we are going to get

4     to outside.  I know you heard from Ms. Newman, who said

5     something about excessive force, or something of that

6     nature.  I think she referenced that in the presentation

7     of the facts here.  But we also don't understand yet from

8     that who that was.

9           And I understood from Mr. White's own testimony

10    that that was Ms. Garcia, or Sergeant Garcia now, who is

11    not a defendant -- not a defendant, not accused now of

12    having engaged in any kind of unreasonable force on

13    Mr. White.  So we will hear from Sergeant Garcia about

14    that.

15          In addition, we will hear other information about

16    how it was things were going on inside the bus station and

17    just outside the bus station.  You can get evidence from

18    the indisputable video evidence we have in this case.

19          Obviously, to the extent that that is the kind of

20    thing that helps sort of detail the circumstances in this

21    case, you need to recognize, from my point of view, at

22    least, that what is important is that you don't make a

23    judgment about the situation until we go through the video

24    and we go through the other evidence associated with this

25    case.

1          It is kind of like when you are watching that

2     television set in front of you, these televisions, we have

3     little pixel points of light.  They make the picture by

4     having a combination of little points of light that take

5     place, like an old-fashioned mosaic.

6          In order to really understand the circumstances

7     that took place here, the important thing is to recognize

8     each little bit of information you get, and whether it is

9     from Ms. Newman or from us, we're not able to testify.  We

10    don't have any evidence to offer.  We can tell you what we

11    expect the evidence to be, which is what I am attempting

12    to do now.

13         But what you get through the process is an outline

14    of how it all worked.  And, importantly, in order to be

15    able to understand this, just like an old-fashioned

16    mosaic, where you put stones together to make a picture,

17    or pixels of the television set, you can't make a judgment

18    until you get all of that.

19         So you will hear from Chafin, Garcia, Burke, Allen,

20    then you will hear from Lieutenant Wyckoff.  Certainly he

21    heard Mr. White say, "these handcuffs are making my hands

22    numb."  No doubt about it, it is in the indisputable video

23    evidence.  But you need to hear what he has to say about

24    that, as well as the other folks associated with this.

25         Of course, we have these.  And these are, as near

1    as I understand it, we will hear testimony about it, these

2    are the handcuffs that were on Mr. White at the time that

3    this video that you just watched took place.  What it

4    amounts to, however, is they weren't too tight.

5          And, furthermore, to any extent there was any issue

6    about their tightness, Sergeant Garcia will tell you all

7    about what she did about that as soon as she was aware

8    that that was the circumstance.  Not only is that true,

9    Officer Chafin will tell you all about why it was that he

10   knows those handcuffs were not too tight.

11         Further, in addition to all of that, you saw that

12   there was a paramedic standing right there who says, I'm

13   not going to do something about that.  You will hear him

14   when you listen to the very beginning of the tape.  And

15   you will hear Mr. White say, "record this."

16         Insofar as the circumstances are concerned in this

17   case, I haven't even gotten to damages yet, really.  The

18   amount of information we have about damages is most

19   importantly received through Dr. Dent, who I think you

20   will hear from today.  And I believe he will come testify.

21   Plaintiff's counsel indicated that is the case, and we

22   will have his records for you to examine.

23         When we do the records, we will try to figure out

24   how to do it so you can get them and have them to take a

25   look at as soon as they are admitted into evidence.  Our

1    belief and association with the damage information is that

2    there is not a basis for saying that Mr. White did suffer

3    any kind of damage at all, let alone any damage associated

4    with any of the things that Dr. Dent is going to talk to

5    you about.

6         Further, beyond all that is concerned of course

7    anything Mr. White has indicated about damage is

8    circumstantial and aren't related to his approach to the

9    facts of the situation, readily, anything that the actual

10   facts are going to demonstrate and we will have Dr. Dent

11   talk to you abut what happened and how that happened.

12        Further, we will have some records for you from the

13   St. Joseph's Hospital, which Mr. White visited after

14   having been released from the jail.  Understand, of

15   course, Officer Chafin and Lieutenant Wyckoff had nothing

16   to do with what happened to Mr. White after he passed out

17   of their custody into the jail system.

18        But once Mr. White was released from the jail, he

19   then went to St. Joseph's Hospital the next morning, at

20   about 10:40 in the morning, and was examined by some

21   medical personnel there, who generated records that are

22   going to be in evidence that you can then take a look at.

23   And you can see what it is that he had to say.  What the

24   medical folks have to say.  What it is they told him

25   needed to be done next for him for care purposes.

1          So, in other words, we will get some information

2     here that will relate to the medical condition as it has

3     been described to you already.  We will get some

4     information here from the other persons who were present

5     about what had occurred.  And we will have the

6     indisputable video evidence to look at.

7          Those are the things that I think will color your

8     ability to create the mosaic associated with this set of

9     facts and make a determination about what should be done.

10    And, frankly, whether or not there was any kind of

11    unreasonable dissociating with anything that happened when

12    Mr. White encountered Officer Chafin and Lieutenant

13    Wyckoff.

14         At the end of having all that information, as you

15    have told the Court, I am hopeful you will have reserved

16    judgment about what to do until you collectively have the

17    opportunity to discuss it, after the case is submitted to

18    you, and return a verdict in favor of the defense.

19         And I very much thank you for your willingness to

20    listen to me this morning.  I certainly understand we will

21    have other opportunities to speak with you, and we will

22    have information to be provided to you so you can fill out

23    all of the pixels in the television set.  Thank you very

24    much.

25         THE COURT:  Thank you very much.  All right, ladies

1    and gentlemen, we have been going -- you are probably

2    hungry.  We will take about an hour-and-15-minute break

3    for lunch.  So return at 1:30.

4         If you are looking for a place to eat, if you go

5    out the front door of the courthouse, directly across the

6    street is a building called the 999 Building.  There is a

7    Subways or Quizno's there.  There is a small restaurant

8    there.  And there is a Starbucks on the other side.

9         But, if you walk all of the way down, three blocks,

10   to 16th Street, there are a slew of different restaurants

11   you can eat at there.

12        Remember not to talk to each other or anybody else

13   about this case.  As counsel indicated, tomorrow afternoon

14   we will be going across the street to the bus depot so you

15   can see what it looks like.  I will give you more

16   direction about that.  But I don't want you going over

17   there on your own any time visiting the scene or doing it

18   on your own.  We decided we will go out across the street

19   as a group.

20        So you are excused until 1:30.  Court will be in

21   recess.

22        (Lunch is taken from 12:14 p.m. to 1:31 p.m.)

23        (The following is had outside the hearing and

24   presence of the jury.)

25        THE COURT:  I know plaintiff indicated before we

1    broke for lunch they were going to put the doctor on

2    later, but my concern is, judging the time it will take

3    you to do direct and cross-examination, to make sure we

4    get him out of here, and the jury isn't going to be

5    listening to very much after 4 o'clock.

6            Is the doctor here?

7            MS. NEWMAN:  He is not here.  So our hope was to

8    put on Mr. White for about an hour, until 2:30, then put

9    on the doctor.

10           THE COURT:  I wanted to make sure there was enough

11   time for cross-examination.

12           MS. NEWMAN:  That is what we were hoping, as well.

13   We thought 2:30 would give us ample opportunity to do

14   direct and cross and get him out of here.

15           THE COURT:  So Mr. White will be your first

16   witness?  I apologize, do you want to escort him to the

17   stand?

18           MR. KILLMER:  Should we do that before the jury

19   comes in?

20           THE COURT:  I think we should probably do that.

21           You may be seated, but when we swear you in, you

22   will have to be standing up.

23           MS. NEWMAN:  If you can keep your cane, that will

24   be great.  Just keep it, that will be great.

25           THE COURT:  Ms. Barnes, you can bring in the jury.

1          (The following is had in open court, in the hearing

2    and presence of the jury.)

3          THE COURT:  You may be seated.

4          When you enter the jury box, you may be seated.  We

5    stand in deference to you.  So when I say, "you may be

6    seated," I mean the rest of the courtroom.

7          We are ready to proceed.  I understand the

8    plaintiff wants to call Mr. White as your first witness.

9          MS. NEWMAN:  That's right, Your Honor.

10         THE COURT:  Ms. Barnes, would you please administer

11   the oath to Mr. White.

12         COURTROOM DEPUTY:  Mr. White, will you please

13   stand.  I will have you raise your right hand.

14                         **PHILIP WHITE**

15   having been first duly sworn, testified as follows:

16         THE DEFENDANT:  Yes.

17         COURTROOM DEPUTY:  Please be seated.

18         Please state your name and spell your first and

19   last names for the record.

20         THE WITNESS:  Philip White.  P-H-I-L-I-P W-H-I-T-E.

21         THE COURT:  Mr. White, I will have to ask you, can

22   you move closer so you speak directly into the microphone,

23   which is right in front of you there.

24         Yes.  All right.  You may proceed, Ms. Newman.

25                      **DIRECT EXAMINATION**

1    **BY MS. NEWMAN:**

2    Q.   Good afternoon Mr. White.  We have gotten to hear a

3    lot about you.  Now the jury gets to hear directly from

4    you.  How old are you?

5    A.   I am 80.

6    Q.   Where did you grow up?

7    A.   I grew up in Michigan, near Flint, Michigan.

8    Q.   And just to get this out of the way quickly, we see

9    you are blind.  Can you describe for the jury how that

10   came to pass?

11   A.   Yes.  I had normal eyesight until I was 11.  And in

12   the fifth grade, after school on a Friday night, I was in

13   a snowball fight.  I was hit in the eye with a small piece

14   of ice.

15   Q.   Did you lose one of your eyes?

16   A.   Yes.  I lost vision in both eyes eventually because

17   of a condition known as sympathetic eye.  If you have a

18   perforated wound in one eye, it frequently affects the

19   other eye.

20   Q.   So is one of your eyes now a prosthetic eye?

21   A.   Yes, my right eye.

22   Q.   What can you see?

23   A.   I really can't -- I can sometimes see light if, for

24   instance, if a light is shown right into my left eye.  But

25   usually I can't tell whether it is daytime or night.

1    Occasionally I can see light if I am looking right at a

2    light bulb.

3    Q.   You described this injury that happened when you were

4    a kid.  Did your parents sue anybody when that happened?

5    A.   No, my parents wouldn't ever think of suing anyone.

6    Besides, back then, I don't think people sued that much.

7    Q.   For that matter, have you ever sued anybody before

8    this time?

9    A.   No.  I have never sued anybody in my life.  No, never

10   thought I would, either.

11   Q.   I see you walk with a cane.  About how tall is that

12   cane of yours?

13   A.   I've forgotten precisely.  It is at least 60 inches.

14   I think it is around 60 inches.

15   Q.   How tall are you?

16   A.   I have shrunk.  I keep saying I am 5 foot 4.  I used

17   to be 5 foot 4 and a half.  Now I am only 5 foot 2.  I am

18   sure you believe that.

19   Q.   Why don't you tell the jury a little bit about your

20   educational background.

21   A.   Well, started at a one-room country school through

22   elementary school, most of the way until I had my eye

23   accident.  And then I, of course, right after high school,

24   I went to a school for the visually impaired, called -- I

25   now forgot what they called it.  Anyway it is for people

1    with low vision or vision impairment.  And they called it

2    Sight Saving back then.  And I went into the school for

3    that.

4    Q.   Did you eventually go to college?

5    A.   Yes, I did.  After graduating my last few years of

6    public school, I went to the Michigan School for the

7    Blind.  And then I went to Michigan State, both

8    bachelor's, and later on finished my master's degree

9    there.

10   Q.   What sort of work did you do?  What kind of career

11   have you had?

12   A.   I was primarily a teacher for 33 years, last few

13   years as a school administrator.

14   Q.   And what sort of school did you teach for?

15   A.   I started out teaching in regular schools.  But then

16   I -- the first school, that was not that way.  That was

17   for the blind.  Actually, I taught at the school for the

18   blind in Salem, Oregon, for 3 years.

19   Q.   What was it?  Sorry, I didn't mean to interrupt you?

20   A.   Yes.

21   Q.   What was it that inspired to you go back and get your

22   master's degree?

23   A.   Well, if I was going to continue in teaching visually

24   impaired and blind people, I needed a certification in

25   that area.  So I was majoring in the education of blind

1    and the visually impaired.

2    Q.   Did you have any sort of leadership positions during

3    your career?

4    A.   Yes.  Well, I guess my first leadership position with

5    the schools was I actually was the representative of the

6    teachers union for our building.  Just from our building.

7    This was in Flint, Michigan, which was a large school

8    district back then.

9         Then, what else?  Well, I was a school

10   administrator for the last few years of my career.

11   Q.   And about when did you retire?

12   A.   Did you say, what year did I retire?

13   Q.   Yeah, approximately.

14   A.   I am going to have to get rid of that approximate.  I

15   taught 33 years.  Let's see, about 1989, I think.

16   Q.   All right.  Did you also do some community service

17   types of work in addition to your teaching and

18   administrator career?

19   A.   I did.  I was -- at one point I was a secretary of an

20   organization called Bold Blind Outdoor Leisure

21   Development.  And then, let's see, I was on the board of

22   directors of the service center for the visually impaired,

23   Genesee County for the visually impaired.  It was a

24   service center for the visually impaired.  It taught

25   people, almost everybody who got a job was medical

```
 1    transcribing.  But we did a lot of things there; teaching

 2    people how to use a cane, how to read Braille, so forth.

 3    Q.   And those are two things you do, aren't they?

 4    A.   I do, and I have done, yes.

 5    Q.   Do you have any children?

 6    A.   I have two sons.  One of my sons, Stephen, was here.

 7    I hope he still is.

 8    Q.   He is.

 9    A.   Okay.

10    Q.   And how old is your son Stephen?

11    A.   How old, is that what you said?

12    Q.   Yes.

13    A.   He is -- he just had a birthday.  I should know this.

14    His birthday is October 22nd.  He is 47 years old.

15    Q.   And where does he live?

16    A.   He lives in Eagle/Vail, which is really a part of

17    Avon, Colorado.

18    Q.   Where do you live?

19    A.   I live about 24 miles west of there, in Eagle,

20    Colorado.

21    Q.   What about your other son, what is his name?

22    A.   His name is Christopher.

23    Q.   How old is he?

24    A.   He is 44.

25    Q.   Does he also live here in Colorado?
```

1    A.    He does.

2    Q.    I'm showing to the jury some family photos, which I

3    am going to describe to you so that you can identify for

4    the jury what they are, all right?

5    A.    Thank you, yes.

6    Q.    All right.  The first photo we are going to put up is

7    a photo based on --

8          THE COURT:  Counsel, you have to let me know what

9    number.

10         MS. NEWMAN:  Your Honor, these are not marked as an

11   exhibit.  These are simply for demonstrative purposes.

12         THE COURT:  You are not admitting them?

13         MS. NEWMAN:  I will not move to admit.

14         THE COURT:  You may proceed.

15   Q.    (BY MS. NEWMAN)  I am showing the jury a photograph,

16   a picture, it looks to be taken in the '70s.  You are

17   standing in short pants and loafers, with two little boys,

18   on a green grassy lawn.  Do you know what that photo is?

19   A.    I don't specifically remember that photo, but I am

20   sure it is my two sons.

21   Q.    Looks to be in the picture that one is maybe 4, one

22   is maybe 7.

23   A.    It could have been in Flint, Michigan, where we

24   lived.

25   Q.    All right.  I am going to show another picture to the

1    jury, which we looked at a little earlier.  The second

2    picture depicts you standing at the top of Gray's Peak,

3    actually wearing kind of a windbreaker.  You have your

4    arms -- you are in the middle, with two people on your

5    sides.  One of them is a young man, about 16 years old?

6    A.   Yeah, I do remember that one, because I only climbed

7    Gray's Peak once.  That was with my younger son,

8    Christopher.

9    Q.   So is the young man picture there Christopher?

10    A.   Yes.

11    Q.   There is a woman to your right.  Is that a friend of

12    yours?

13    A.   Actually, she was a friend of mine, yes.

14    Q.   I am going to show one more picture.  This one

15    depicts you sitting in some bleachers along with Stephen

16    and another kind of older guy.  Do you know what this

17    picture is?

18    A.   That is very recent, this past summer, I think at the

19    Rockies' baseball game, with Stephen and his

20    father-in-law.

21    Q.   All right.  One more picture is of you holding a cute

22    baby.  The baby looks to be less than a year old, and you

23    are standing there holding this cute baby.

24    A.   That is probably my grandson, Caleb.  If I look a lot

25    older, I think that would be Caleb, my grandson, who just

1    now turned 5 this past September.

2    Q.   All right.  I want to talk a little bit about your

3    experience taking the Greyhound bus.  So we are shifting

4    topics.

5         As a blind man, how is it that you get around?

6    A.   Well, I either walk, or I take buses a lot.  Been

7    taking buses since -- I started taking buses when I went

8    to that Sight Saving School.  My parents would drive me to

9    the city limits, and I would take the city bus to the

10   school.

11   Q.   So that was decades ago?

12   A.   Yeah.  Almost centuries.

13   Q.   Maybe not quite that long.

14   A.   That would have been when I was -- started in the 6th

15   grade, I went there.

16   Q.   Let's talk specifically about Greyhound.  How long

17   have you been taking the Greyhound?

18   A.   Greyhound, I probably took -- there are two basic bus

19   stations in Michigan.  Mainly, Greyhound is the most, then

20   Indian Trails.  But I used those from the time I was -- I

21   think really I didn't use them until I entered college.

22   Q.   Could you even estimate how many times you have used

23   a Greyhound bus?

24   A.   No.  But it is a lot of times.  I really can't

25   estimate.  You know, I would say a minimum of 12 times a

1    year, on average.

2    Q.   Have you been on a Greyhound bus since the events

3    that we're talking about here today, the events of May of

4    2012?

5    A.   No.  I haven't gone near Greyhound since then.  It

6    has been almost 3-and-a-half years.

7    Q.   The Court staff has poured you a glass of water.

8    A.   My voice is gone.

9    Q.   Let me give you a minute to drink it.

10        MS. NEWMAN:  Thank you, Ms. Barnes.

11        THE WITNESS:  Thank you, I don't know if that

12   helps.  I hope it does.  All right.

13   Q.   (BY MS. NEWMAN)  Are you generally familiar with

14   Greyhound's policies?

15   A.   Yes.

16   Q.   Do you need any kind of special permission to be at a

17   Greyhound station?

18   A.   I don't think so.

19   Q.   I am going to describe to you one of the policies of

20   the Greyhound.  It has been marked as an exhibit.  It is

21   Exhibit No. 29.  Given the circumstances, I am just going

22   to describe it to you to see whether you are familiar with

23   it, and then if you are, we will be able to go ahead and

24   show it to the jury.  All right?

25   A.   Yes.

1    Q.   So this is a Greyhound document, and it is called

2    "traveling by bus."  Are you generally familiar with that

3    document?

4    A.   Yes.

5         MS. NEWMAN:  Move to admit.

6         THE COURT:  Any objection?

7         MR. LYONS:  We have no objection, Your Honor.

8         THE COURT:  All right.  Exhibit 29 is admitted.

9         (Exhibit No. 29 is admitted.)

10        THE COURT:  You may publish.

11        MS. NEWMAN:  Can the jury see it?

12   Q.   (BY MS. NEWMAN)  Mr. White, I have pulled out two

13   paragraphs from the top, "how we operate."

14        MS. NEWMAN:  Can the jury read it?  Is it clear

15   enough?

16   Q.   (BY MS. NEWMAN)  Okay.  The first section is "how we

17   operate."  And what it says at the very top is:  No

18   reservations are necessary when you travel with Greyhound.

19   Is that consistent with your understanding of the rules

20   for Greyhound?

21   A.   Yes.  And my experience, too.  Yes.

22   Q.   The next sentence reads:  If you know the departure

23   schedule, simply arrive at the terminal at least an hour

24   before departure to purchase your ticket.  Is that

25   consistent with your understanding of what the Greyhound

1    rules were at the time?

2    A.   Yes.

3    Q.   Then it goes on to say:  Boarding generally begins 15

4    to 30 minutes before departure.  Was that consistent with

5    your understanding of the rules?

6    A.   I know that is the usual case, yes.

7    Q.   Then the next thing it says is:  Seating is on a

8    first-come, first-served basis.  So did you understand

9    seating was available on a first-come, first-served basis?

10   A.   I think I just assumed that was true.  I don't know

11   if I ever saw it anywhere.

12   Q.   Then the last sentence of that first paragraph of the

13   policy says:  Advance purchased tickets do not guarantee a

14   seat.  Was that your understanding of the rules?

15   A.   Yes.

16   Q.   All right.  Then the next paragraph down describes

17   what happens when there are too many people for the bus.

18   It says:  When Greyhound fills a regularly-scheduled bus

19   with passengers during times of peak demand, Greyhound

20   plans for additional buses to accommodate passengers

21   beyond the seating capacity of a single bus for any given

22   schedule.  However, our ability to add extra sections

23   depends on the availability of buses, drivers, and the

24   number of passengers.

25        Is that also consistent with your understanding of

1    what the rules were at the time?

2    A.   That is my understanding, yes.

3    Q.   All right.  Then there is another section a little

4    bit down, and it is kind of bolded.  I will have that

5    highlighted so the jury can read it, too, then I will

6    direct you to it by describing it.  It starts with

7    "customers with disabilities."

8         There is a sentence that reads:  Customers with

9    disabilities who need travel assistance should call the

10   Greyhound Customers with Disabilities' Travel Assist

11   Line -- and it gives a phone number -- at least 48 hours

12   prior to departure.

13        Were you aware there was that line available for

14   travelers with disabilities who needed assistance?

15   A.   Yes, I think it started after the ADA.

16   Q.   Was that a service that you liked to take advantage

17   of?

18   A.   I tried it out once.  It didn't seem to be necessary.

19   I got quite a bit of help without doing that if I needed

20   it.  And it was -- you know, you lost all our flexibility

21   that way, if you made special arrangements and then you

22   changed your mind or you couldn't go with that specific

23   time or didn't show up, that was not -- they didn't

24   appreciate that, I don't think.

25        I never tried that, telling them I was going to be

1    there and didn't show up.  But the thing is, yeah, I just

2    didn't think it was necessary.  I used -- I have gotten

3    along well without it years before that policy was

4    adopted.

5    Q.   So were you able to successfully travel on Greyhound

6    for years, even without calling that 48-hours-in-advance

7    line?

8    A.   Yes.

9    Q.   All right.  Before the events that we're here to talk

10   about today, in May of 2012, did you ever have any

11   problems with Greyhound?

12   A.   Nothing serious, no.

13   Q.   Did you have a situation when the bus was sold out

14   ever?

15   A.   I had that happen.  I had it happen a couple of times

16   outside of Colorado.  It happened -- this would have

17   been -- the incident was the third time it happened in

18   Colorado.

19   Q.   All right.  Let's talk about that a little bit.  So I

20   want to direct you to the first time in Colorado when you

21   came to get a Greyhound bus and it turned out it was sold

22   out, okay?

23   A.   Yes.

24   Q.   Can you describe for the jury what happened that

25   time?

1    A.    Okay.  The first time I experienced that at the

2    Denver Greyhound Station was maybe somewhat less than 2

3    years prior to this incident we're dealing with.  And do

4    you want me to go on and describe the whole thing?

5    Q.    What I would like you to describe is what happened?

6    What did you end up doing?

7    A.    Oh.  That time they told me it was full.  So the

8    ticket salesman -- so I asked the ticket salesman, I have

9    to figure out how to spend the night in Denver.  I asked

10   him if he knew of a good hotel around that wasn't too

11   expensive.

12   Q.    Were you expecting he or Greyhound was going to pay

13   for your hotel?

14   A.    No.  That never entered my mind that they would pay

15   for it.  That would be unusual for that.

16   Q.    Are you reaching for your water?

17   A.    No, I am looking to make sure I am talking into the

18   microphone.

19   Q.    You are doing great.

20   A.    The thing is, he was thinking about it.  He said, I

21   don't know about a hotel, he said maybe you could stay

22   where the Greyhound drivers stay.  He said, but I have to

23   clear it.  We have to clear it with the manager.

24   Q.    Was he able to do that?

25   A.    Yes, right away.  And so it was all set.  And I did

1    that, and it worked out great, very well, very good.

2    Q.    Did that hotel provide you transportation to and from

3    the bus terminal?

4    A.    They did.  They provided everyone, all of their

5    tenants transportation within 4 miles.  For instance, I

6    went to actually my bank at that time, not having lived in

7    Colorado very long, was Chase Bank, which is the closest

8    Chase Bank to Eagle, Colorado, is the one here in Denver.

9    So I needed to go visit them, so I did that.  They took me

10   there the next morning.

11   Q.    So it turned out fine?

12   A.    They said when I was ready to go, just call them.

13   And it did work fine, yes.

14   Q.    Did you pay for your own hotel room?

15   A.    Yes.

16   Q.    All right.  Now I want to turn to the second time

17   that you had the Greyhound bus sold out in Colorado.  What

18   happened that time?

19   A.    Pretty much the same thing, up to the point when the

20   ticket seller called the hotel to reserve a room for me,

21   to get a room for me, and they were full.  So I couldn't

22   use it at that time.  And the hotel was full.

23   Q.    Were you angry about that?

24   A.    No, not at all.

25   Q.    Did you feel like somehow you were being mistreated?

1   A.   Not at all.  No.  I was a little disappointed, but I

2   wasn't angry with anyone.

3   Q.   All right.  So this third time, we are going to talk

4   about this one in a little more detail, but I will lead up

5   to it.  Why had you come to Denver in May of 2012?

6   A.   There was a presentation being made by St. Joseph's

7   Hospital regarding -- most of it was regarding technology

8   for the blind.  Like, you know, talking computers, et

9   cetera.  Many things.  And they also had a presentation on

10  nutrition for people who had low vision.  I think that was

11  a medical doctor -- no, a nutritionist.

12  Q.   How did you come to this?  How did you get there?

13  A.   I took the Greyhound to Denver, and then I believe I

14  took a taxicab over to St. Joseph.

15  Q.   What was your plan in getting back home to Eagle?

16  A.   The other way around.  Same thing.  I may have taken

17  Access-a-Ride.  I can't remember if I took Access-a-Ride,

18  which is a special program for people who can't drive or

19  with disabilities, or a regular cab to the station, and

20  then was going to take the Greyhound to Vail.

21       And then I had made arrangements, you have to call

22  24 hours in advance to get what they call paratransit in

23  Eagle County, so it would give me a ride to Eagle.

24  Q.   So was the paratransit ride arranged to pick you up

25  at the point when the Greyhound got to Vail?

```
 1    A.    That's correct, yes.

 2    Q.    What about the Greyhound ticket, had you bought that

 3    in advance?

 4    A.    No.  I hadn't bought the ticket in advance.  Because

 5    usually you go down there and get a ticket, except for

 6    those few occasions which I encountered.

 7    Q.    Did you -- what rules did you have to keep in mind in

 8    order to get your ticket to go back to Vail?

 9    A.    Could you repeat that, please?

10    Q.    Were there any rules you needed to keep in mind to

11    get your ticket to go home?

12    A.    Well, the ticket home, yeah.  To stay, if you are

13    going to get the paratransit in Eagle County, you need to

14    make the arrangements 24 hours in advance, by phone you

15    can do it.

16    Q.    What about Greyhound's rules.  What rules did you

17    want to follow to get your Greyhound ticket back to Vail?

18    A.    They suggest that you arrive an hour ahead.  I was

19    there more than an hour in advance that day.

20    Q.    Let's talk about what happened.  So can you describe

21    what happened when you arrived at the Greyhound station on

22    the 22nd of May 2012?

23    A.    Yes.  I was dropped off near the front door.  And I

24    walked to the door.  And a man asked me if he could help

25    me with anything, I guess.  And I said, yeah, I want to
```

1    buy -- I said, yes, you can make it easier for me to find

2    the ticket -- where the line starts to buy a ticket.

3    Q.   Did he help you do that?

4    A.   He did.  I asked him also if he was a security guard,

5    because I think I had somebody do that once before who

6    wasn't a security guard.  And he said he was.

7    Q.   Once you got to the ticket counter, what happened?

8    A.   I was first in line.  And the ticket lady said, we're

9    all sold out of those tickets for that particular

10   schedule, which was at 12:15 p.m.  She said, you have two

11   options, one being to wait around and see if there is a

12   cancellation, which might give you a seat, or you can wait

13   until the next bus leaves, which I believe was something

14   like 7:30 in the evening.

15   Q.   What did you think about the options?

16   A.   Well, I thought I would wait and see -- I probably

17   wouldn't have waited for the second option if the first

18   one didn't work.

19   Q.   What was it about the second option that you didn't

20   like?

21   A.   Two things.  Mainly, it is a long time to wait around

22   a bus station.  The other thing is that -- well, I would

23   have missed my ride, my reserved ride from Vail to Eagle,

24   because it was a specific time when I was supposed to be

25   picked up in Vail, I believe.  Yes.

```
 1    Q.   So, in the meantime, while you were waiting for that
 2    12:15 bus to see if there was a cancellation, what did you
 3    do?
 4    A.   Oh, I asked the ticket lady -- she didn't suggest it
 5    this time.  She didn't suggest I talk to the manager, so I
 6    asked.  I thought she might not have known about it or
 7    something.  So I asked her if I could speak to the bus
 8    station manager.
 9    Q.   What was your thought process in doing that?  What
10    were you hoping to have happen?
11    A.   I thought I could do the same thing I did the first
12    time.  I thought maybe I could get a ride, or let me see
13    or get a room at the VQ Hotel, it is called, that the
14    drivers stayed in.
15    Q.   Did you have some expectation that you were entitled
16    to that?
17    A.   Not at all, no.  I never thought I was entitled to
18    it.  I thought it was a good deal, though.
19    Q.   So tell me the conversation that you had.  Did the
20    manager come out and speak with you?
21    A.   She said, well, you will probably have to wait.
22         MR. LYONS:  If he is going to report on what she
23    said, it is hearsay.  And she is an identified witness who
24    will testify here.
25         MS. NEWMAN:  Your Honor, I am not offering it to
```

1    prove the truth of the matter asserted, but to prove

2    Mr. White's state of mind was, in terms of what she was

3    communicating to him.

4          THE COURT:  All right.  So, ladies and gentlemen,

5    this statement by someone else is considered hearsay; that

6    is an out-of-court statement if it is offered for the

7    truth of what is stated.  But Ms. Newman is offering it

8    not for the truth.  You will hear from that witness.  She

9    will tell you what she said.  But you are to consider it

10   only for why he then did what he did.

11         The objection is overruled.

12         MS. NEWMAN:  Thank you.

13   Q.   (BY MS. NEWMAN)  Mr. White, you can continue.  What

14   is it that the manager told you when she came out to talk.

15   A.   The manager said the same thing as the ticket sales

16   lady; that I had two options.  One was to wait and see if

17   a seat became available.  And the other was to take the

18   next bus, as I recall.  I wasn't aware of that second bus.

19   Q.   You mean what time in the evening that second time

20   was?

21   A.   Because I didn't know there was a second bus of my

22   own knowledge, except they told me.  But I didn't know.  I

23   could wait for it, she said, or I could wait for the 12:15

24   bus to see if anyone didn't show up or cancelled out, so I

25   can get a seat.

1           I thought she said, or you could -- I am not sure

2    what she said at that time because a bus came in and there

3    was a lot of noise.  The bus door opened.  I didn't hear

4    what she said.

5           I said -- do you want me to carry on?

6    Q.   You didn't hear what she said, and then what

7    happened?

8    A.   Well, I said to her, what other option do I have?

9    And at that point, the security guard said in a loud

10   voice, "you're trespassing.  You have to get out of here."

11   Q.   Did you have any understanding as to why he said

12   that?

13   A.   Not at all.  I was bewildered.

14   Q.   Were you angry at anybody at that point?

15   A.   No.  I don't think I was angry at anyone yet, no.

16   Q.   Had you threatened anyone?

17   A.   No.

18   Q.   Had you shaken your cane at anyone?

19   A.   Absolutely not.

20   Q.   So what was your reaction when the security guard

21   told you that you were trespassing and that you had to

22   leave?

23   A.   Well, I replied to him -- I can remember clearly, I

24   said "wait a minute.  I want to finish my conversation

25   with the manager."

1    Q.    Did you get an opportunity to finish the conversation

2    with the manager?

3    A.    No.   He said, "she's left.   She didn't want to talk

4    to you."

5    Q.    Did you know whether she was still there or if she

6    had left?

7    A.    Well, I assumed he was telling me the truth.   No, I

8    didn't know, because she was never standing very close to

9    me, and she was a few feet away when she did talk to me

10    for a brief time.   So that is all I knew at the time.   I

11    was surprised.

12    Q.    So did the security guard explain to you what he was

13    talking about?

14    A.    Let's see.   Well, no.   No.   To make it brief, no, he

15    didn't.

16    Q.    What was your reaction after the ticket saleswoman

17    and the main manager told you that you had these options;

18    to wait for the 12:15 or the later bus, and then the

19    security guard is telling you that you are trespassing and

20    you have go?

21    A.    Well, I wasn't sure if he was standing next to me

22    both times, when both the people, the women told me this

23    same thing.   And so I thought he probably heard them.   So

24    I was -- I just couldn't quite figure it out.   I started

25    figuring out maybe trespassing means different things to

1    different people.  That is what I was thinking.

2    Q.   Did somebody call the police?

3    A.   I called the police.

4    Q.   Why did you call the police?

5    A.   I didn't immediately, but when I found out this

6    looked like -- I called the police.  Did you say, why did

7    I call the police?

8    Q.   You said you called the police.  The question I am

9    asking is, can you explain to the jury why?

10   A.   He went on to say, "either you are going to get out

11   of here, or I am going to take you out of here."  And

12   then -- well, actually, he -- let's see.  He said -- after

13   that I said, "well, I would like for you to explain to me

14   why I have to leave."  And he says -- well, I already said

15   that.  He said, "if you don't leave, I am going to call

16   the police."

17          Then he left.  And I was thinking, maybe I should

18   call the police.  Maybe they can tell me if I am in the

19   right or the wrong.  And if I am in the wrong, I would

20   leave.

21   Q.   Did you think you were in the wrong?

22   A.   Well, I didn't think I was.  I couldn't -- you never

23   know, there are some unusual rules that I have heard, laws

24   and things that I didn't know about.  Maybe, but I didn't

25   know.  I had never encountered anything like this quite in

1    my life.

2    Q.    Did you have any past experience with police

3    officers?

4    A.    I never had anything except positive experiences with

5    police officers.  And I always supported the police and

6    was always defending them when they were accused of -- I

7    figured if they arrested somebody, they are usually right.

8    But I have re-adjusted my thinking now to some degree.

9    Q.    Have you known any police officers in the course of

10   your life?

11   A.    Well, I can remember way back my dad had a couple

12   real good friends as policemen.  In fact, one became head

13   of the State Police of Michigan, Mel Kauffman.

14   Q.    Did you see policemen anywhere else during your time

15   growing up and otherwise?

16   A.    Yeah.  I encountered policemen.  They were always

17   helpful to me.  I figured they were helpful to me, yeah.

18   I had never had, that I can ever remember, any bad

19   relationship with any police.  I was always -- if I had

20   good vision, I thought I probably would try to become a

21   policeman, if I was normally seeing or something.

22   Q.    Did you have police officers in your church?

23   A.    Yes.  Yes.  I knew a policeman at church when I was

24   young.  And then I knew another policeman in more recent

25   times also at our church.

1   Q.   So when you made that call, did you believe the

2   police would help explain to you what was going on?

3   A.   I was hoping he would explain to me and clear things

4   up.  I don't know what to say about that.  I just don't

5   know why, until this day, if anyone could have explained

6   that to me, I never would have gone through all of this.

7        MS. NEWMAN:  All right.  I have been passed a note

8   that Dr. Dent is here.  If you don't mind, I will take a

9   break in your testimony so we can accommodate Dr. Dent's

10  schedule, then resume afterwards?

11       THE COURT:  We are going to interrupt the

12  examination because we have a doctor from out of town and

13  he can only testify today, so I want to take him, and then

14  we will continue.

15       Mr. Killmer, if you will help Mr. White.

16       COURTROOM DEPUTY:  Your attention, please.

17                      **DR. EDWARD DENT**

18  having been first duly sworn, testified as follows:

19       THE WITNESS:  I do.

20       COURTROOM DEPUTY:  Please be seated.

21       Please state your name, and spell your first and

22  last names for the record.

23       THE WITNESS:  Edward Dent.  E-D-W-A-R-D D-E-N-T.

24                   **DIRECT EXAMINATION**

25  **BY MS. NEWMAN:**

1   Q.   Good afternoon Dr. Dent.

2   A.   Good afternoon.

3   Q.   Can you please tell the jury a little bit about

4   yourself.  Why don't we start with your educational

5   background.

6   A.   I went to medical school at Tulane University in New

7   Orleans, where I graduated with honors.  And then I

8   attended a 3-year residency program for family medicine at

9   Poudre Valley Hospital in Fort Collins.

10  Q.   And what is it you do now?

11  A.   I am a partner with Colorado Mountain Medical, which

12  has offices in Eagle and Edwards and Vail, and also staff

13  an emergency clinic in Copper Mountain.

14  Q.   Which office do you practice out of?

15  A.   In Eagle primarily.

16  Q.   What sort of practice is it?

17  A.   A family practice.

18  Q.   How long have you been doing that now?

19  A.   For 16 years.

20  Q.   You said there was also a Copper Mountain facility.

21  Do you do any work with that branch?

22  A.   During winter, during ski season, we have an

23  emergency slope-side clinic, which sees orthopedic

24  injuries, that sort of thing.

25  Q.   Do you serve in that capacity?

1    A.    Yes.  I work there during ski season.

2    Q.    How long have you been doing that?

3    A.    The entire time I have been working with Colorado

4    Mountain Medical.

5    Q.    What sort of professional memberships are you

6    involved in?

7    A.    So, I am a member of the Colorado Medical Society and

8    the American Medical Association.

9    Q.    Are you a member of the American Academy of Family

10   Physicians?

11   A.    That's correct.

12   Q.    What sort of certifications do you hold, in addition

13   to your medical degree, of course?

14   A.    So, I am board certified in family medicine.

15   Q.    Do you know Mr. White?

16   A.    Yes, I do.

17   Q.    How is it that you know him?

18   A.    So, Mr. White has been a patient of mine for about 5

19   years.

20   Q.    Do you know him socially?

21   A.    No.

22   Q.    Have you ever spent any time with him outside of your

23   office?

24   A.    No.

25   Q.    Do you see him walking around town?

96

```
 1   A.   I have seen him walking around town.  It is a small

 2   town.

 3   Q.   Would you say you have seen him as much in recent

 4   years as past years?

 5   A.   It doesn't seem like quite as much.

 6   Q.   Based -- so you have been treating Mr. White for 5

 7   years, you say?

 8   A.   That's correct.

 9   Q.   Based on those 5 years of treating Mr. White, how

10   would you describe him?

11   A.   Mr. White is a very kind gentleman.  He is always

12   courteous to our staff and my nurse.  My nurse would

13   usually let me know if there were any patients that were

14   difficult to deal with or being rude.  Mr. White has

15   always been very pleasant.  Just a pleasure to see as a

16   patient.

17   Q.   Is he an accurate reporter of the facts?

18   A.   He is very accurate.  He does like to chat a lot.

19   When it comes to getting information out of him regarding

20   medical facts, he is very succinct.

21   Q.   Can you rely on the information that he provides to

22   you?

23   A.   Yes.  It seems very reliable.

24   Q.   Is he honest?

25   A.   Yes, I believe so.
```

1   Q.   As a patient, is he cooperative?

2   A.   He is very cooperative.  My recollection is that I

3   believe we had to do some cardiac work up on him before,

4   which requires a patient to show up for certain tests, and

5   he followed through with that.

6   Q.   Is he a complainer or whiner?

7   A.   No.  He will tell you about things that concern him,

8   but he doesn't seem like someone that excessively uses the

9   clinic or our services.

10   Q.   Does he express entitlement?

11   A.   I don't believe so.

12   Q.   Is he, in your 5 years of experience working with

13   him, is he paranoid?

14   A.   No.  I wouldn't describe him as paranoid.

15   Q.   Does he appear to understand the directions you give

16   him?

17   A.   Yes.  He does seem very clear about the things we ask

18   him.

19   Q.   When you describe medical diagnoses, does he seem to

20   understand what it is you are saying?

21   A.   I believe so, yes.

22   Q.   Based on all of your observations over 5 years of

23   treating Mr. White, do you have anything negative to say

24   about him?

25   A.   Not necessarily.  Like I said, he does like to chat.

1    And I don't necessary consider that extremely negative.

2    As a small-town doctor, I often get to know my patients.

3    That is about as negative as I can get.

4    Q.   Have you treated -- so I will shift gears a little

5    bit and talk specifically about the events that bring us

6    into court here, and those are the events that occurred on

7    May 22, 2012.

8           So the question I have is, have you treated

9    Mr. White for injuries associated with that?

10   A.   Yes.

11   Q.   What is the nature of the injuries that you have

12   treated Mr. White for associated with that event in May of

13   2012?

14   A.   So, the primary thing that comes to mind is concerns

15   about numbness in his right hand, I believe, and also he

16   had consulted me a few times about pain in his jaw, or

17   TMJ-type symptoms.

18   Q.   I will take those in course.  So the first one you

19   brought up is this numbness in his hand.  Did you make a

20   diagnosis as to what was the cause of the injury?

21   A.   So, the working diagnosis was that there could be

22   some neuropathy in the ulnar distribution, which would be

23   consistent with numbness or pain towards the pinky side of

24   his hand.

25   Q.   Can you describe for the jury -- to the extent you

1    need to use your own hands as a demonstrative, we can talk

2    through it so it ends up on the record with the court

3    reporter, as well.  What does that mean, an ulnar

4    distribution?

5    A.   So, there are three main nerves that are part of the

6    hand functioning.  And so there are sensory and motor

7    functions.  So our sensation that we feel is one function

8    of nerves.  Then motor is movement of your hand.  So the

9    ulnar nerve would mainly give us sensation towards the

10   pinky side of the hand, including half of the ring finger,

11   the pinky, and that side of the hand.

12        Primarily on the palm surface, another nerve would

13   give sensation on the back of the hand.  And the motor

14   function of the ulnar nerve would be to move the fingers

15   and motion, such as this.

16   Q.   In terms of this ulnar nerve, where is the nerve,

17   itself?

18   A.   A little branch of the ulnar nerve does exist right

19   near the wrist.

20   Q.   All right.  And so you were saying that that was one

21   of the diagnoses that you had.  Is it your diagnosis, to a

22   reasonable degree of medical certainty, that that ulnar

23   nerve damage was caused by the cuffing in May of 2012?

24   A.   Yes.  Based on the information that I have, primarily

25   his history, that would be consistent with that type of

1    symptom.

2    Q.    You said his history.  Did Mr. White have history of

3    ulnar nerve damage before May of 2012?

4    A.    Not that I am aware of.

5    Q.    All right.  We talked, or you said something briefly

6    about a jaw issue.  Tell me what that is all about?

7    A.    I think he had complained of some jaw area pain where

8    the joint is, called the TMJ joint.  And I think he had

9    asked me if that could be caused from an injury, such as a

10   head injury.  And I believe my response was that it was

11   possible, but not necessarily always caused by trauma.

12   Q.    So it is one of those things we just can't know?

13   A.    That's correct.

14   Q.    All right.  I will get into a little more detail, but

15   let's talk a little bit about the head trauma.  Are you

16   aware that one of Mr. White's concerns was a blow to his

17   head in May of 2012?

18   A.    Yes, I am aware of that.

19   Q.    Have you seen photos of that injury?

20   A.    Yes, I have.

21         MS. NEWMAN:  And I would like to show Exhibit 1,

22   page 2 this is a stipulated exhibit.

23         THE COURT:  Exhibit 1?

24         MS. NEWMAN:  Exhibit 1, page 2.

25         THE COURT:  It is not stipulated to on the one you

1    gave to me.  The list I have does not have Exhibit 1

2    stipulated.  Is there any objection?

3         MR. LYONS:  No, Your Honor.  I believe it has been

4    stipulated.

5         THE COURT:  To the entirety of Exhibit 1, are you

6    offering it at this time?

7         MS. NEWMAN:  Sure, we can offer -- put into

8    evidence the entirety of Evidence 1.

9         THE COURT:  Exhibit 1 will be admitted.  You may

10   publish.

11        (Exhibit No. 1 is admitted.)

12   Q.   (BY MS. NEWMAN)  So hopefully you can see Exhibit 1,

13   page 2 on your screen.

14   A.   Yes.

15   Q.   Have you seen this photo?

16   A.   Yes, I have.

17   Q.   And what does it depict, with regard to -- from the

18   perspective of a doctor treating Mr. White?  What is

19   interesting about this photo to you?

20   A.   It appears to be a skin injury to the right forehead

21   area.  Difficult to tell the exact detail, but it appears

22   to be -- possibly to be a contusion or bruise, including

23   the bleeding, which could be an abrasion or laceration.

24   Q.   And let's turn to the next page, that is Exhibit 1,

25   page 3.  Hopefully it will come up right in front of you

1    in a moment.  There you go.

2          Does that -- now, this a picture that shows the

3    blood having been wiped off.  Does this help you, as

4    doctor, to diagnose better what the issue is?

5    A.   So now you can see the wound a little better.  It

6    appears to be more of an abrasion or loss of a bit of skin

7    surface of about a 50 cent piece size.  It doesn't appear

8    to be as much of a laceration at this point.

9    Q.   I am going to show you page 1 of that same, exhibit

10   which witnesses who are coming on will testify later is

11   the counter that Mr. White's head hit.  So I will show you

12   the first page of that exhibit.

13         So, looking at this counter, does that give you a

14   little additional information, from a diagnostic

15   perspective, of the type of injury that that wound shows?

16   A.   So, this is the counter?

17   Q.   At the Greyhound Bus Terminal.

18   A.   Yes.  So it appears to be a rounded edge surface,

19   which would be consistent with a blunt-type injury like

20   that, which would be bruising and abrasion or slight skin

21   tearing there.

22         MS. NEWMAN:  All right.  And we can take the

23   picture down.  Thank you.

24   Q.   (BY MS. NEWMAN)  So, from a medical perspective, what

25   are the kinds of concerns associated with that sort of

1    injury?

2    A.   Well, just looking at it superficially, one might

3    judge it to be not necessary to suture it or concern that

4    the actual superficial injury will result in any problems.

5    But any sort of blunt head trauma, especially to a

6    gentleman of his age, which now I believe is 80 --

7    Q.   He was 77 at the time.

8    A.   -- 77 at the time, especially for a patient of that

9    age, I would be concerned about blunt head trauma.  So,

10   additionally, in the first 24 to 48 hours, one would be

11   concerned that the patient could have something severe

12   happen to them, such as bleeding inside their brain or a

13   blood clot, something that might require surgical

14   intervention.

15        Simply a concern that every doctor would have about

16   a head trauma.  But then if that were to pass by without

17   something surgical like that, then your concern would be a

18   mild traumatic brain injury, or often called a concussion.

19   Q.   Is it possible, from a medical perspective, is it

20   possible to get a concussion if you don't get knocked out?

21   A.   That's correct.  In fact, 90 percent of people who

22   have mild traumatic brain injury don't lose consciousness.

23   Q.   If Mr. White testifies during the course of this

24   trial that he suffered some vertigo and dizziness, kind of

25   symptoms intermittently after this event, would that be

1   consistent with the kind of blunt force brain injury you

2   are talking about?

3   A.   Yes, it would.

4   Q.   And if Mr. White testifies that those kinds of

5   symptoms were intermittent; not all of the time, but dizzy

6   from time to time, but not every moment of every day, what

7   is your reaction to that from a medical perspective?

8   A.   That would still be consistent with that type of head

9   trauma.

10  Q.   Why is that?

11  A.   Well, those types of injuries can sometimes seem like

12  they are getting better, and some of the symptoms could

13  relapse.   It is very difficult to give exact predictions

14  about how the course of the recovery from that kind of

15  incident will be.

16        For example, an athlete in a football game gets hit

17  in the head, and it may seem they are doing really well,

18  then we might increase their rehabilitation, have that

19  patient start exercising, anticipating return to play.

20  And so we often see those players make complaints of

21  headache later.   So it needs to be assumed that that was

22  from the head trauma, so they can't safely return to play.

23  Q.   Is there a particular treatment that you would

24  require under those circumstances, or just to avoid that

25  kind of heavy activity?

1    A.   Well, just moving back to the treatment of that type

2    of injury, I would say generally the recommendation is to

3    rest, so to allow the brain to heal.  And it wouldn't

4    necessarily be medications or other specific treatments

5    other than advising rest, and then a person could

6    gradually return to their activities as long as their

7    symptoms allow it.

8    Q.   So, for example, if Mr. White testifies later he went

9    and got medical attention the next morning after this

10   thing happened, is there anything that -- other than

11   assessing the fact that he was complaining of these

12   symptoms, is there anything that could be done?

13   A.   About his head injury?

14   Q.   Yes.

15   A.   Well, there is no specific surgical or medical

16   medication type of treatment that would be done.  But as

17   far as a treatment plan, one could advise the patient to

18   rest, and either tell the patient or someone that was with

19   him to observe for any signs of worsening.

20   Q.   All right.  Based on the -- having seen the injury,

21   the mechanism of the injury, and Mr. White's descriptions

22   of his symptoms, what was the cause of that injury, from

23   your medical perspective?

24   A.   I would say that it appears that he had a blunt force

25   trauma in the bus station, and he had some symptoms that

1    were consistent with that, such as dizziness.

2    Q.   Is that your opinion to a reasonable degree of

3    medical certainty?

4    A.   Yes.

5    Q.   I am going to go ahead and show you some records.  We

6    will start at Exhibit No. 22.

7         MS. NEWMAN:  I believe, Mr. Lyons, is this a

8    stipulated exhibit?  This is the entirety of the St.

9    Joseph's medical records.

10        MR. LYONS:  Yes, ma'am.

11        MS. NEWMAN:  This is a stipulated exhibit, so we

12   are at Exhibit 22.

13        THE COURT:  You need to move its admission.  Even

14   though it is stipulated, you need to move admission of

15   Exhibit 22.

16        Exhibit 22 is admitted.

17        (Exhibit No. 22 is admitted.)

18        THE COURT:  You may publish.

19   Q.   (BY MS. NEWMAN)  Dr. Dent, I am showing you the

20   records that are from St. Joseph's Emergency Room the day

21   after Mr. White received those injuries.  Are you familiar

22   with these records?

23   A.   Yes, I am.

24   Q.   Let's go ahead and page through them.  And as we get

25   to things that are interesting, then we will stop.  So the

```
 1    first page I would like to focus on is page 22-6.  So the
 2    6th page of the medical records.
 3         I will have my paralegal draw it out for you,
 4    because it is a little hard to see.  Under "Triage Notes,"
 5    where it says "patient with c/o possible assault."
 6    A.   It appears to be something like a chief complaint,
 7    which would be taken by the triage nurse.  "Patient here
 8    with complaints of possible assault.  Patient is blind,
 9    and reports the cops beat him up yesterday for
10    approximately 12 hours."
11    Q.   Have you discussed the events that Mr. White
12    attributes these injuries to with him?
13    A.   Yes, I did.
14    Q.   Do you have some understanding as to whether he is
15    asserting he was beat up for 12 continuous hours?
16    A.   I don't believe that is the case.  I think the
17    incident was much shorter than that, and that he was
18    detained for approximately 12 hours.
19    Q.   Next point down, where it says "HPI General," sort of
20    about mid-page.  Can you read that, Doctor?
21    A.   So, "Patient presents to emergency department for
22    evaluation.  Patient states he believes he was assaulted
23    by unknown people that stated that they were police at the
24    Greyhound Bus Station.  Patient states no loss of
25    consciousness, no nausea/vomiting.  Patient felt dizzy
```

1    yesterday, but symptoms resolved today."

2    Q.    Let's stop there for a moment and talk about that.

3    With regard to the head injury you were just describing,

4    does the fact he didn't lose consciousness lead you to

5    believe anything one way or the other?  Let me ask it a

6    better way.  What does the fact that he didn't lose

7    consciousness tell you about the head injury?

8    A.    Well, losing consciousness could indicate a more

9    severe head injury.  But, again, I would take that into

10   account, still believing a head injury very likely to have

11   occurred.

12   Q.    Next thing says, "no nausea or vomiting."  What does

13   that tell you from a medical perspective?

14   A.    That is a symptom of one that sustained a head

15   injury, like a concussion.

16   Q.    What does the absence of it tell you?

17   A.    Not much.

18   Q.    So it doesn't lead you to believe it couldn't have

19   been a concussion?

20   A.    That's correct.

21   Q.    That was a double negative and not much of a

22   question.

23   A.    It would not lead me away from the diagnosis of a

24   head injury, like a concussion.

25   Q.    All right.  Next thing it says is, "patient felt

109

```
 1    dizzy yesterday, but symptoms resolved today."  Does that
 2    lead you, from a medical perspective, to conclude the
 3    injury is done?
 4    A.   No.  I would still think symptoms could occur later
 5    on.  But I would take that as being somewhat reassuring as
 6    the history taker there.
 7    Q.   If Mr. White testifies that the symptoms of dizziness
 8    and vertigo continued on for some period of time, though
 9    diminishing over the course of the next year, is that
10    inconsistent with the medical report from the day after?
11    A.   It would not be inconsistent.
12    Q.   Why is that?
13    A.   As we stated before, these kind of symptoms can vary.
14    In different cases they can come and go.  They might stay
15    constantly for some patients before they get better.  So
16    that can vary.
17    Q.   We will move to the next sentence that I stopped you
18    at right before you started reading it.  The "just
19    complains."  What does that one say?
20    A.   I am sorry?
21    Q.   "Just complains"?
22    A.   "Just complains of bilateral wrist pain and slight
23    numbness in the left dorsum of thumb."
24    Q.   What does bilateral wrist pain mean?
25    A.   Both sides.
```

110

1    Q.   Both wrists?

2    A.   Both wrists.

3    Q.   What is "the left dorsum of thumb," what does that

4    mean?

5    A.   So the left thumb, the dorsum would be the back

6    surface.

7    Q.   One of the things you talked about earlier is the

8    diagnosis of right ulnar damage.  Is this inconsistent

9    with the diagnosis that you later made?

10   A.   This is not inconsistent with that.  It is talking

11   about the other hand, I believe.  And so it does not

12   contradict the right-handed symptoms.

13   Q.   So the fact he is not complaining of the numbness in

14   his right hand the day after, does that say anything to

15   you, from a medical perspective?

16   A.   Well, it is reassuring reading this record.  It is

17   possible that the history taker asked -- specifically

18   asked specifically about that or perhaps the patient

19   didn't offer it, but it means he is not complaining of

20   that at this time.  However, it doesn't mean that he

21   couldn't have some nerve symptoms later on.

22   Q.   What does the bilateral wrist pain tell you in terms

23   of your subsequent diagnosis of right ulnar nerve damage?

24   A.   It does increase the possibility that the patient

25   might have some later complaints about his other wrist.

1    Q.   I will turn to the next page of the document.  So

2    this is 22-7.  Midway through the page we get to a section

3    called "Musculoskeletal," about a third of the way down.

4    Looks like this is essentially the same.

5          Is there anything about this sentence that tells

6    you anything different than what we discussed where it

7    says "bilateral wrist pain"?

8    A.   It is still part of the history taking.  Did you want

9    me to read it?

10   Q.   Well, particularly this word that those of us who

11   aren't doctors, don't know?

12   A.   "Bilateral wrist pain and dorsal thumb paraesthesias

13   of the left thumb."

14   Q.   What does that mean?

15   A.   Paraesthesias can encompass things like numbness or

16   discomfort, tingling, pins and needles.  That would be

17   paresthesias.

18   Q.   I will move down to the next kind of section down,

19   where it talks about the "Physical Exam," and particularly

20   where it talks about the "Head" of the physical exam.  Can

21   you go ahead and read that and explain to the jury if

22   there is any significance in that, given everything you

23   know?

24   A.   Under "Head" it says, "Head examine included findings

25   of head atraumatic."

1    Q.   Is that consistent with what you have observed --

2    what you observed at the time?

3    A.   No.  Atraumatic means there is no outward evidence of

4    trauma.  So seeing the picture you showed, presumably from

5    the day before this exam, that wouldn't be consistent with

6    an atraumatic head exam.

7    Q.   What is your conclusion with regard to that sentence?

8    A.   So, sometimes in the course of using these electronic

9    medical records, which I'm presuming, it is likely that

10   this is an electronic medical record.

11        MR. LYONS:  Objection if he is going to speculate

12   about what happened with regard to that.

13        THE COURT:  Sustained.

14        MR. LYONS:  Thank you.

15   Q.   (BY MS. NEWMAN)  Let's move to the section that is

16   called "Upper Extremity."  All right.  Are you able to

17   read that?

18   A.   "Motor strength normal.  Sensation intact.  Radial

19   pulse normal."

20   Q.   Do those three sentences tell you anything that is

21   inconsistent with your diagnosis?  The fact he still has

22   motor strength, does that lead to you believe you are not

23   right about the ulnar nerve damage, or is that different?

24   A.   It doesn't contradict the fact that there could be

25   ulnar nerve injury.

1    Q.   All right.  And then the next section talks about

2    "b/l" which we learned was bilateral.  "Bilateral mild

3    wrist swelling and skin --" there is another doctor word.

4    A.   So, "Bilateral mild wrist swelling and skin

5    erythema."

6    Q.   What is that?

7    A.   So that would mean soft tissue swelling in both

8    wrists.  Skin erythema is redness.  So consistent with a

9    soft tissue injury such as handcuffs.

10   Q.   How does that relate to your ultimate finding of the

11   ulnar nerve damage?

12   A.   It would increase the likelihood there could be ulnar

13   nerve damage.  As I discussed before, the ulnar nerve

14   passing along the wrist near the pinky side, that that

15   could be consistent with that type of injury.

16   Q.   Is there anything about the next sentence that is

17   noteworthy for purposes of your diagnosis?

18   A.   It goes on to say, "neurovascular intact distally,"

19   meaning that circulation and neurological functioning,

20   including sensation and motor functioning, were intact

21   distally, meaning further away from the body, from the

22   injury.

23        "Sensation grossly intact, but patient notes

24   slightly decreased sensation of left thumb."  So that

25   would be the physician testing and asking the patient if

```
 1    he can feel sensation, but when doing that exam, the
 2    patient reported that he felt less sensation in his left
 3    thumb.
 4    Q.   The fact that Mr. White didn't report what you
 5    ultimately ended up diagnosing in his right hand, does
 6    that contradict your finding?
 7    A.   It doesn't contradict it, because with nerve
 8    injuries, it is possible that initially it wasn't present.
 9    May not have been.  It could have been distracted by other
10    injuries, such as swelling or pain in his other hand, or
11    head injury may have distracted him from symptoms in his
12    right hand.
13    Q.   All right.  The last sentence on this page that I
14    wanted to just point out to you is the diagnosis at the
15    bottom.  What does this diagnosis state to you?
16    A.   So the physician says, "status post assault," meaning
17    that he is now at a point after an assault occurred, and
18    that is his only diagnosis.
19    Q.   Okay.  The next page includes the doctor's orders.
20    What do you understand regarding these orders?
21    A.   So the doctor ordered wrist films of three views of
22    both wrists.  He ordered a breathalyzer; that would be an
23    alcohol test.  A urine tox screen, so testing for illicit
24    drugs.  And, I am sorry, so the nurse indicated that the
25    breathalyzer was cancelled.  And then apparently the
```

1    breathalyzer was ordered again.

2    Q.   Based on the 5 years that you have treated Mr. White,

3    have you ever known him to be a drinker?

4    A.   No.

5    Q.   Have you ever known him to be a substance abuser?

6    A.   No.

7    Q.   Not even a substance abuser, but even a substance

8    user, other than whatever it is you have prescribed for

9    him?

10   A.   No.  I am not aware of any substance or alcohol use

11   or abuse.

12   Q.   And, as a doctor, even if a patient doesn't tell you

13   about that sort of thing, are there ways you know it?

14   A.   Sometimes through behavioral clues, or sometimes even

15   general chemistry or laboratory work, sometimes these

16   things are suspected.  But I have not seen those in

17   Mr. White's lab work.

18   Q.   All right.  The next section down, there is a little

19   bit of a narrative where the nurse talks a bit about her

20   interaction with Mr. White, among other things.  Stating

21   that he is "afraid of the police right now."  Had he ever

22   expressed to you before that event any fear of the police?

23   A.   Repeat that?  I am sorry.

24   Q.   Had Mr. White ever expressed to you, before 2012, any

25   fear of police?

1  A.   No, he has not.

2  Q.   Also seems to express a little bit of confusion.  Did

3  that happen from time to time with Mr. White?

4  A.   No.  Mr. White is always very lucid and clear headed.

5  No clues of dementia or other mental capacity problems.

6  Q.   Based on your 5 years of treating Mr. White, do you

7  have some explanation as to confusion this morning after

8  the events of May 22, 2012?

9  A.   Well, based on having this interaction that I am

10  aware of, I would think a person would be upset, so

11  becoming irritated or agitated could certainly make

12  someone not act like themselves.  The normal personality

13  might be changed if they're upset or stressed out about an

14  event like that.

15  Q.   I will turn you to the next page, particularly the

16  whole top paragraph.  The first thing it talks about is

17  the "Mechanism of Injury."  So I would like for you to

18  just kind of to go through this with the jury and explain

19  bit by bit what this means.  If you don't mind I will stop

20  you from time to time as appropriate.

21  A.   So "Mechanism of injury, patient reports injury from

22  unknown object."  Do you want me to continue?

23  Q.   Based on your diagnosis, have you figured out what

24  the object was?

25  A.   From my understanding, it was the countertop at the

1    bus station.

2    Q.    All right.  You can go ahead and continue.

3    A.    "Pain assessment findings include:  Patient complains

4    of pain described as sharp.  Pain location, right side of

5    forehead.  On a scale of 0 to 10, patient rates pain as 6.

6    Intermittent onset of pain yesterday."

7    Q.    How does that compare with your diagnosis of this

8    head trauma?

9    A.    That would be consistent with that.

10    Q.    All right.  Going down to the next bit, where it

11    talks about the "Skin"?

12    A.    "Skin:  Inspection findings include abrasion to right

13    side of forehead.  Bilateral posterior hands."

14    Q.    What does that mean, for the jury's benefit?

15    A.    So, that would be both hands, behind the hand area,

16    posterior.  "Right cheek.  Inspection findings include

17    ecchymosis --"  that means bruising, "-- to left upper

18    chest.  Inspection findings include redness to right

19    wrist/forearm.  Inspection findings include swelling to

20    right forearm."

21    Q.    With regard to all of that swelling and redness that

22    you have just read to us, do you have a diagnosis as to

23    what it was that caused that?

24    A.    That would be consistent with having handcuffs on.

25    Q.    And would it also be consistent with your ultimate

1    finding of this nerve damage?

2    A.   Yes, it would be consistent with that.

3    Q.   Then the next part?

4    A.   "Patient states he was assaulted yesterday for 12

5    hours by Denver Police after being taken into custody from

6    the Greyhound Bus Terminal, Denver.  Reporting numbness in

7    left thumb."

8    Q.   All right.  That seems largely repetitive of what we

9    have already talked about.

10        Later on, the "Braden Scale," it says, "patient has

11   no apparent problem moving."  Does that tell you anything

12   that is inconsistent with any of your findings?

13   A.   Nothing inconsistent with my findings.  It is simply

14   saying his movement or motor functioning is normal.  No

15   apparent problem moving.

16   Q.   All right.  Then the nursing notes describe Mr. White

17   being "difficult."  The question I want to ask is, has

18   Mr. White ever been difficult at all with you?

19   A.   He has never been difficult with me.

20   Q.   Has he ever been difficult with any member of your

21   staff?

22   A.   He has never been difficult with my assistant or my

23   nurse or my front office staff.

24   Q.   If he were, would you know about it?

25   A.   Typically, I would.  If that type of thing occurs,

1    usually my staff lets me know.  My nurse and I work

2    closely together.

3    Q.    Under those kind of circumstances, what do you do?

4    A.    So, if something of that nature did arise, I would

5    definitely talk to the patient about it, and talk about

6    things that aren't appropriate or aren't acceptable.

7    Q.    So, is this description of Mr. White consistent with

8    your experience with him?

9    A.    It is not consistent with my experience with him.

10   Q.    All right.  I am going to flip forward a few pages

11   until we get to the doctor's diagnosis and observations,

12   at 2213, starting with the "ED Notes," and the diagnosis

13   there.  Can you read that?

14   A.    Yes.

15   Q.    Okay.  Is there anything there that we haven't

16   already talked about?

17   A.    No.  I believe we've talked about this already.

18   Q.    All right.  Let's go on to the next page.

19         MS. NEWMAN:  Jesse, if you can pull out the first

20   page, up to "Historian," or I guess up to "Exacerbated

21   By."  Is this essentially the same information that we

22   have already discussed, but this time coming from the

23   doctor?

24   A.    This appears to be the same narrative as the other

25   note we reviewed.

120

1    Q.   This, again, talks about "feeling dizzy yesterday,

2    but the symptoms having resolved from on the 23rd."  Does

3    that lead you to believe that that head issue is totally

4    done right there on the 23rd?

5    A.   No.

6    Q.   I don't want to belabor this too much, but the "Upper

7    Extremity," which is down there at the bottom, if you can

8    read that.  Is there anything different than the earlier

9    notes reflect?

10   A.   It looks like the exact same narrative we just went

11   over.

12   Q.   Okay.  Then the next page has discharge instructions.

13   Do you see those discharge instruction there?

14   A.   Yes.

15   Q.   What is the "discharge"?

16   A.   "Contusions."

17   Q.   What does that mean?

18   A.   So, bruises.  That would be a general sense of

19   bruises anywhere on the body.  So that would be general

20   instructions on how to take care of bruises.

21   Q.   Then the next thing it says is to "follow up with

22   primary care physician within the next couple of days."

23   Is there anything about the type of injury that Mr. White

24   was complaining about, that if he didn't follow up within

25   a couple of days, would cause those injuries to persist

1    longer than they would have otherwise?

2    A.   If he didn't follow up in a couple of days, it is not

3    likely to have changed the course of his injury.

4    Q.   So, for example, if he followed up within the month,

5    does that change anything?

6    A.   No.

7    Q.   All right.  Next section of this record includes a

8    "Behavior Health Assessment" that starts at 22-18.

9         MS. NEWMAN:  And if we can pull out the "Assessment

10   and Diagnosis" aspect of it.

11   Q.   (BY MS. NEWMAN)  Just a preliminary question.  Do

12   you, in your medical practice, have the opportunity to see

13   these kinds of behavioral health assessments, as well?

14   A.   Yes.

15   Q.   All right.  The "Assessment and Diagnosis" of

16   Mr. White that you see here, if you can take a look at

17   that and walk the jury through what is remarkable or

18   interesting about that.

19        MR. LYONS:  Your Honor, that is a little compound,

20   first of all.  Secondarily, it is quite vague.  It gives

21   the doctor no real instruction with respect to the

22   question.

23        THE COURT:  Sustained.

24   Q.   (BY MS. NEWMAN)  All right.  I was hoping to shortcut

25   at little bit, but I will take you through bit by bit.

1          The first section discusses a denial of feeling

2     suicidal or having homicidal ideation or feeling

3     depressed.  Is that consistent with your medical treatment

4     with Mr. White throughout the 5 years you have worked with

5     him?

6     A.   Yes, it is.

7     Q.   The next sentence, it says, "he appeared anxious and

8     said he was feeling anxious since yesterday, when he was

9     allegedly beaten by police."  Had he ever expressed that

10    kind of anxiousness to you in the past, over those 5

11    years?

12    A.   Yes, he did express some anxiety over the event in

13    the bus station.

14    Q.   After the fact?

15    A.   After the event happened, yes.

16    Q.   Had he ever expressed anxiousness to you before that?

17    Was he an anxious patient before that?

18    A.   I can't remember any expression of anxiety before

19    that event.

20    Q.   The next sentence, "He denied auditory/visual

21    hallucinations, and did not appear to be responding to

22    internal stimuli."  What does that tell you from a medical

23    perspective?

24    A.   Those kind of findings would be someone who might

25    have psychosis of schizophrenia.  So that appears

1    consistent with Mr. White.

2    Q.   So they are saying here he is not psychotic or

3    schizophrenic?

4    A.   Correct.

5    Q.   Is that consistent with your perspective, as well?

6    A.   Yes, it is.

7    Q.   Next sentence says, "he presented to the emergency

8    department for wrist pain after the incident."  Is that

9    appropriate for him to self-present to the emergency

10   department after experiencing the kind of event he had on

11   the 22nd?

12   A.   Yes, that would be appropriate.

13   Q.   What does that tell you about Mr. White, as a

14   patient?

15   A.   It seems like he took appropriate action that most

16   people would take after sustaining an injury.

17   Q.   Let's go ahead to the next page.  Why don't we do it

18   paragraph by paragraph.  "Presenting Problem (what brought

19   him to the emergency room.)"  I will give you and the jury

20   a moment to look at it.

21   A.   Specifically, Mr. White "self-presented to the

22   emergency department with complaint of possible assault by

23   police."

24   Q.   Is that consistent with what you have heard from

25   Mr. White, as well?

1    A.    Yes, it is consistent with that.

2    Q.    "He reported feeling anxious about retribution, but

3    wants to go to court:  Did he talk to you about that sort

4    of thing?

5    A.    Yes, he did talk about feeling anxious about the

6    event that happened, as well as pressing charges.

7    Q.    Did -- all right.  Then we can -- the next thing

8    talks about him having to come to this meeting for the

9    visually impaired at the St. Joseph Hospital Russell

10   Pavilion.  What does that tell you about the fact that the

11   medical provider apparently checked out and confirmed

12   that, in fact, that event was happening?

13   A.    I find that to be very thorough by that provider.

14   Q.    Let's go down to the middle paragraph, the "Current

15   symptoms and objective findings."  All right.  This record

16   is from the day after the May 22 event, where it says,

17   "Current symptoms and objective findings."  He talked

18   again about this feeling of anxiousness and fear of

19   retribution, so we will not talk about that again.

20         But, the next sentence, he says, apparently, to

21   this medical provider that "he has not trusted Denver

22   Police since yesterday, (four to six individuals he had

23   contact with, not the entire force.)"  What does that tell

24   you about Mr. White's mental capacity?

25   A.    That sounds like an appropriate response to an

1    adverse event that occurred at the bus station, and it

2    does seem appropriate he would not hold the entire

3    authorities or the entire police force in distrust.

4    Q.   What do you learn from the next sentence that uses a

5    little medical jargon?

6    A.   The next sentence?

7    Q.   Yes.

8    A.   "He was alert and oriented X4."  That means that he

9    knew who he was, where he was, what the date was, and what

10   his situation was.  "He was sitting upright on a chair

11   wearing street clothing.  He has an abrasion on upper

12   right forehead.  He was cooperative with the evaluation,

13   was friendly and pleasant."

14   Q.   Is that consistent with all of your observations,

15   having treated him?

16   A.   Yes, it is consistent.

17   Q.   The next thing talks about him walking with a cane

18   and being able to barely see light.  He has talked about

19   that already, so I don't want to belabor the point.

20        The next sentence, "affect was congruent with mood,

21   which was upbeat, though he appeared anxious when talking

22   about the incident with the police, and described it as

23   'horrible.'"  Has he described to you likewise?

24   A.   I can't remember the exact adjective he used, but

25   definitely when he talked about it, it was an adverse

```
 1    event in his life.
 2    Q.    And here he says, "he is afraid they will kill him."
 3    Has he talked with you about that?
 4    A.    I don't remember talking about it, of being killed.
 5    Q.    He goes on about the Court date the next month.  So
 6    that is the criminal appearance.  Then it says something
 7    about him overelaborating when being asked questions.  Is
 8    that consistent with your experience with him, as well?
 9    A.    Yes, that is consistent.
10    Q.    And "overelaborating," what does that mean?
11    A.    So, he would chat and have lots of details that may
12    be relevant to the story he is trying to relate, but not
13    always, so --
14    Q.    All right.  Next place where these records get kind
15    of interesting is 22-20.  And these appear to be the
16    radiology results.  And so I would like you to interpret
17    these for the jury.  22-20.  These are the radiology
18    reports from Dr. Pei.  What does "radiology reports" mean?
19    A.    That would be a radiologist, a doctor reading x-rays,
20    formally provides a report of his findings, not Dr. Pei,
21    but the radiologist.
22    Q.    Can you explain what this all means?
23    A.    So the findings to the right wrist, "no right wrist
24    fracture was seen."  So there wasn't a fracture in the
25    bone seen.
```

1        So then it goes on to describe, "there is moderate

2    severity degenerative change involving the trapezium --"

3    which is one of the small bones in the wrist,

4    "-- first metacarpal joint --" which is the metacarpal

5    joint near the small wrist bones, "-- and at the distal

6    pole of the scaphoid."  Being another small wrist bone

7    toward the thumb.  "Bony sclerosis and cystic changes

8    noted here, with some mild marginal osteopetrosis."  These

9    are all findings that are consistent with arthritis in the

10   wrist.  "Scaphoid shows no convincing evidence of fracture

11   at this time."

12       That is important, because that bone, if it does

13   fracture, often can have difficulty healing.  So he noted

14   that "there is some minor degenerative change in the right

15   ulnar joint," where the forearm bone comes together and

16   forms a joint in the wrist.  "Degenerative changes" being

17   arthritis.

18   Q.   Before we move on to the left wrist, let's talk about

19   the right.  So what does this tell you with regard to your

20   ultimate diagnosis of that right ulnar nerve injury, if

21   anything?

22   A.   So, it is helpful to know he didn't have a fracture,

23   but it also describes all of those degenerative or

24   arthritic changes, which would be expected in quite a high

25   percentage of people age 77.

1          But it doesn't dissuade me from the fact that he

2    could have sustained some blunt injury to his ulnar nerve,

3    as described in the area we talked about before.

4    Q.   Now, these are radiology records.  Would these even

5    show nerve damage?

6    A.   No, they would not.

7    Q.   Why is that?

8    A.   Because they are only taking pictures of the bones

9    and the joints around the bones, and so there is no

10   picture of the nerves.

11   Q.   Would the fact that Mr. White has this degenerative

12   ostearthritis associated with his age, have any bearing on

13   his vulnerability to nerve damage?

14   A.   So, arthritis, in and of itself, would be somewhat

15   expected in a high percentage of the people of his age.

16   It doesn't specifically relate to nerve damage.  At his

17   age nerve damage would be more likely to have occurred in

18   someone of perhaps 20 years of age.

19   Q.   Is there anything about the just regular arthritis

20   that would explain the numbness that he has complained

21   about in his right ulnar area?

22   A.   No.  Nothing about that arthritis would cause ulnar

23   nerve complaints.

24   Q.   All right.  We will move to the left side now, and I

25   will let you interpret that.

 1    A.    "No wrist fracture is seen."  Again, note is

 2    "degenerative change involving the trapezium first

 3    metacarpal joint and the distal pole of the scaphoid."  So

 4    same findings found in the right wrist are seen in the

 5    left, as far as arthritis.  "Radial ulnar joint here also

 6    appears to show some mild degenerative change.  Scaphoid

 7    appears intact."  No disruption of it or fracture.

 8    "Impression; no wrist fracture.  Degenerative changes as

 9    noted."

10    Q.    Is there anything about that that is inconsistent

11    with the types of injuries that you diagnosed?

12    A.    It is not inconsistent with nerve symptoms.

13    Q.    All right.  Next several pages of those documents are

14    essentially blank, so the jury will have the opportunity

15    to review them, but we don't need to go through them with

16    you.

17          Next documents I would like you to turn to are

18    Exhibit No. 20.  Are you able to see that on your screen?

19    A.    I am able to see it.  It is a little blurry.

20    Q.    My screen is so light I can't see it.  Are you

21    familiar with this document, Doctor?

22    A.    I have seen it before.

23    Q.    What is this?

24    A.    This would be an assessment from the Denver Sheriff's

25    Department, so the Detention Center health staff.

1          MS. NEWMAN:  I move to admit Exhibit No. 20.

2          MR. LYONS:  May I voir dire, Your Honor?

3          THE COURT:  No.  Do you have an objection?

4          MR. LYONS:  The objection is that he hasn't seen it

5     but there is no basis for him to know other than the fact

6     he has seen it.

7          THE COURT:  Lack of foundation?

8          MR. LYONS:  Exactly.

9          THE COURT:  Sustained.

10    Q.   (BY MS. NEWMAN)  Let me ask you, does this document

11    provide any guidance with regard to your own diagnosis of

12    any of Mr. White's injuries?

13    A.   So, moving down --

14         THE COURT:  Don't testify as to it, answer the

15    question.

16         THE WITNESS:  I am sorry, could you repeat the

17    question?

18    Q.   (BY MS. NEWMAN)  Sure.  Is there anything on this

19    medical document, that was taken the day of the injury,

20    that provides any insight into your diagnosis of

21    Mr. White's medical injuries?

22         MR. LYONS:  Same objection, Your Honor.

23    Furthermore, at this point it is an effort to try to

24    bolster.  He already had a diagnosis sometime long after

25    the events in question.  I don't see how, if he didn't see

1    it at the time of the diagnosis --

2         THE COURT:  All right.  That's enough.  That is the

3    question you need to ask, is when did you first see this

4    document?

5         THE WITNESS:  I saw the document yesterday.

6         THE COURT:  You hadn't seen it before?

7         THE WITNESS:  No.

8         THE COURT:  Then it is not relevant.

9         MS. NEWMAN:  Your Honor, I would say this is not

10   objectionable hearsay because it is a statement -- it

11   includes statement made from medical diagnosis of

12   treatment, so it is under 803.

13        THE COURT:  You have to lay foundation, Ms. Newman.

14   This witness can't lay the foundation if he just saw it

15   yesterday.

16        MS. NEWMAN:  All right, Your Honor.

17   Q.   (BY MS. NEWMAN)  Does this document describe a

18   medical history that was provided to get -- to provide a

19   medical diagnosis?

20        MR. LYONS:  Same objection, Your Honor.

21        THE COURT:  Sustained.  He can't talk about the

22   contents of it.

23        MS. NEWMAN:  All right.  I will move along.

24   Q.   (BY MS. NEWMAN)  Why don't we turn to Exhibit No. 26,

25   Doctor.  Are you familiar with these records?

1    A.    Yes.   This is my progress note for Mr. White.

2          MS. NEWMAN:  Move to admit.

3          THE COURT:  It is stipulated; correct?

4          MR. LYONS:  Yes, Your Honor, this one is

5    stipulated.

6          THE COURT:  All right.  Exhibit 26 is admitted.

7    You may publish.

8          (Exhibit No. 26 is admitted.)

9    Q.   (BY MS. NEWMAN)  We will focus on the first

10   paragraph.  So this document, that is Exhibit No. 26, what

11   was the date of this visit?

12   A.   The 28th of June, 2012.

13   Q.   And it shows at some point, a little later, the date

14   of July 7, 2012.  What does that indicate?

15   A.   That means it was documenting the dictation was

16   finished on that date.

17   Q.   About a week after the visit, itself?

18   A.   That's correct.

19   Q.   What is the process that you use to dictate your

20   notes?

21   A.   I used voice recognition software.

22   Q.   Does that have some imperfections?

23   A.   Yes.  Sometimes it might say "she," for instance,

24   when it is a male patient.  Other typographical errors can

25   occur.

1    Q.   One of the things that you -- well, it appears you're

2    evaluating quite a few things here on June 28, 2012.  Why

3    is that?

4    A.   That is often seen in a family medicine practice,

5    where people might come in with multiple unrelated

6    complaints.

7    Q.   And what was your main concern in this visit?  What

8    was it you were really focused on?

9    A.   So it appears that I was focusing on his cholesterol

10   or lipid lowering medication, and whether or not it caused

11   a rash, and also whether or not he should be on that

12   medication.

13   Q.   Why was that your main focus?

14   A.   It appears that that is the thing that I commented on

15   the most.  You have the history -- the "history of present

16   illness" up here.  So the note, in its entirety, seems to

17   focus more on that issue.

18   Q.   And does your "history of the present illness"

19   dictation, does that include everything you and the

20   patient talked about?

21   A.   Oftentimes, not everything that is discussed is put

22   down on paper in the medical record.

23   Q.   What is the purpose for you of these records?

24   A.   So, the purpose of these records is so if I look back

25   on this record, it can help me remember what we discussed

1    that day.  It can help another provider, who might be

2    seeing the patient, with a similar problem.

3    Q.   So one of the things that this record says is "she

4    --" apparently that is a typo, "-- reports having some

5    numbness in his hands, but this has resolved."  Do you see

6    that?

7    A.   Yes.

8    Q.   What does that tell you with regard to the injuries

9    that Mr. White is still complaining about?

10   A.   So, it tells me that he could have sustained some

11   injury to the ulnar nerve, which is still persisting,

12   appears like a month after the event happened,

13   approximately.

14   Q.   The fact that this note talks about it having

15   resolved, but then there are later records that bring it

16   back up, what does that tell you?

17   A.   Well, it is consistent with a nerve injury,

18   especially a blunt nerve injury, such as with handcuffs,

19   or any other blunt nerve injury, as opposed to a nerve

20   injury where the nerve might be completely cut or

21   lacerated.  That would be more likely to be permanent and

22   not coming and going.

23   Q.   So the fact that this report from a visit in late

24   June indicates a resolution, does that make you disbelieve

25   any testimony that Mr. White -- medical reports he has

1    given to you and testimony he will give in court that

2    there is some continuing injury?

3    A.   No, I don't disbelieve there could be continuing

4    injury based on this narration.

5    Q.   By the way, do you have any interest at all in the

6    outcome of this litigation?

7    A.   No.

8    Q.   Is anybody paying you to be here?

9    A.   No.

10   Q.   Just thought I would get that resolved.

11        Now, the next sentence says, "This was associated

12   with recently being arrested for an episode at the bus

13   stop."  One of the things we know is it is not exactly a

14   bus stop.  What does that tell you?

15   A.   That it is not -- I am sorry, you asked if it is not

16   a bus stop?

17   Q.   What we understand here, from the testimony, is it

18   was a Greyhound Station event?

19        MR. LYONS:  Objection to helping a witness in this

20   manner to fill in the blanks.

21        THE COURT:  Sustained.

22   Q.   (BY MS. NEWMAN)  All right.  Is there -- I would like

23   to turn you to the next part, just under that, where it

24   has "Review of Systems," then those bolded headings.  The

25   neurological finding here is "Present numbness."  What

1    does that tell you?

2    A.   So, "Review of Systems" covers different systems that

3    I was addressing that day.  So "present numbness" could

4    mean there was a complaint and I didn't comment on it

5    further.  So when looking back on this, I would probably

6    rely more on my narrative of the history of present

7    illness.  But it does relate that numbness was part of the

8    complaints.

9    Q.   All right.  I will turn to another record, which is

10   Exhibit No. 27.  Do you recognize Exhibit 27?

11          MS. NEWMAN:  I believe it is stipulated, Mr. Lyons;

12   is that correct?

13          MR. LYONS:  We are just checking.  One second.

14   Yes, it, indeed, is stipulated.

15          THE COURT:  Exhibit 27 is admitted.

16          (Exhibit No. 27 is admitted.)

17          THE COURT:  You may publish.

18          MS. NEWMAN:  Thank you, Your Honor.

19          THE COURT:  Could you get me an updated list,

20   because mine doesn't show it is stipulated?

21          MR. LYONS:  Absolutely.

22   Q.   (BY MS. NEWMAN)  Could you please state what this

23   document is?

24   A.   So this is my medical record from November 5th of

25   2013, seeing Mr. White.

137

```
 1    Q.   The narrative section talks about Mr. White's review

 2    of his current lawsuit case with you.  Can you describe

 3    what it was that you are communicating there?

 4    A.   So, when I use that phraseology, "current lawsuit

 5    case," I use that to encompass all of the events that

 6    happened, including the events at the Greyhound Bus

 7    Station, his detention, and as well as his pending

 8    lawsuit.

 9    Q.   And he describes some of the same things he had

10    previously described, so we will not belabor those.  But

11    the second line down, you say, "he complains of some

12    numbness in an ulnar distribution in both hands, but

13    especially on the right hand, which is now a lot better."

14    Can you describe exactly what that means?

15    A.   So he complained of numbness.  He didn't state that,

16    "Doctor, I have symptoms in an ulnar distribution," that

17    is simply my translation of his symptoms.  So, again, I

18    would refer to that side as the pinky side of the hand.

19    And so that was both sides, but more so on the right side.

20    But I noted that he had reported to me that the symptoms

21    were better than before.

22    Q.   And if he has complained that they have sometimes

23    come back, would that be inconsistent with this record

24    from November of 2013?

25    A.   That is not inconsistent.
```

138

1    Q.   The next sentence you talk about his reading.  Can

2    you describe what Mr. White described to you there?

3    A.   So, I mentioned that it inhibited him from reading

4    Braille normally.

5    Q.   Did you have some understanding as to why that would

6    be, from a medical perspective?

7    A.   Well, I would think that with Braille reading, you

8    would want to have normal functioning of your hands to be

9    as efficient as possible reading Braille.  So if there

10   were numbness or other symptoms, that could inhibit one's

11   ability.

12   Q.   All right.  Next sentence talks about TMJ.  You

13   brought that up very briefly at the beginning of your

14   testimony.  What does that mean?

15   A.   So the temporal mandibular joint is that joint near

16   your ear, where your mandible moves the jaw.

17   Q.   And what do you understand this complaint to be

18   about?

19   A.   So, I can remember that he complained of some pain to

20   that area.  I did mention that he couldn't remember any

21   direct injuries to his jaw, face, or TMJ area.  So that

22   meaning that that specific area of the face or jaw is what

23   I was referring to.  And that I noted some physical

24   therapy that I had ordered for him.  He responded well to

25   that.

1   Q.   The next sentence, it talks about being under stress

2   because of his lawsuit.  What was that all about?

3   A.   So, again, going back to my phraseology of "current

4   lawsuit case," I would include the events of the Greyhound

5   Bus Station and detention, in addition to the pending

6   lawsuit with that phrase.

7   Q.   Does stress have some impact on this TMJ?

8   A.   Stress could have an effect on painful joints,

9   absolutely.

10  Q.   Now, since it talks about the lawsuit, I just want to

11  ask you.  Do you have any suspicion that Mr. White told

12  you these things in order to enhance his presentation in a

13  lawsuit?

14  A.   I don't think he was trying to enhance his

15  presentation of the lawsuit.  I think he did want me to

16  know about the details of the injuries and things he was

17  complaining about.

18  Q.   Did he explain to you why he wanted you to know about

19  the details of those injuries he was complaining about?

20  A.   Well, he wanted to present the history of why it had

21  happened.  But, on this particular day, I believe I also

22  wrote that he went into fairly great detail regarding this

23  event, that being as I referred to, the "current lawsuit

24  case," which, again, I think is referring to the incident

25  in the bus station, as well.

1      And he really went into great detail.  He told me

2   all of the events.  His interpretation of all of the

3   events.  As we talked about Mr. White's personality, that

4   was consistent with that; that he wanted to take the time

5   to discuss all of the specific details.

6      He never said, and, by the way, I really want to

7   build up this case.  He just simply wanted to tell me the

8   details of everything that happened to him.

9   Q.   Have you ever had a patient that you believed, in

10   fact, was giving you information for the purpose of

11   building a case?

12   A.   I have had patients likes that before.

13   Q.   And how is it that you are able to discern that sort

14   of thing?

15      MR. LYONS:  Well, Your Honor, unless we have the

16   fundamentals of what happened with the other patient, how

17   can we possibly understand any response he provides?

18   Q.   (BY MS. NEWMAN)  What happened with the other

19   patient?

20   A.   One patient came to mind that had a workman comp or

21   an occupational health injury of a sprained ankle, and

22   that case lasted for about 2 to 3 years, which normally

23   that type of injury would be expected to get better faster

24   than that.

25   Q.   What medical conclusion did that lead you to draw?

1    A.    That his complaints seemed to be a little bit out of

2    proportion to the mechanism that he had been injured in.

3    Q.    And with regard to Mr. White's complaints, and

4    continuing complaints about the injuries that he has

5    sustained, do you draw any of those same kind of

6    conclusions?

7    A.    I didn't draw any of those conclusions because he

8    described the symptoms he was having, and didn't press me

9    necessarily of how to manage that or what tests or

10   specialist referrals I might make.  He simply wanted to

11   discuss those symptoms with me.

12   Q.    Actually, at the very bottom of the page, you talk

13   about "Impressions."  Let's talk about that briefly.

14   A.    So this part of the narration is where we make

15   diagnoses or working diagnoses and discuss how we might

16   manage those things.  In other words, an assessment or

17   impression, and then it includes a plan.

18   Q.    And what plan did you and Mr. White discuss, in terms

19   of resolving the issues he was concerned about?

20   A.    So the first one, I don't think is relevant to the

21   case, and that would be that he had a scaly skin lesion

22   that I addressed that day.

23   Q.    All right.

24   A.    So the second one was TMJ, and that would be my

25   assessment or diagnosis.  And then I went on to say that,

142

1    "Luckily this has improved with conservative measures,"

2    meaning physical therapy.  I did say "It would be

3    difficult to tell if this is associated with his recent

4    lawsuit --"  and, again, that phrase, meaning the trauma

5    sustained at the bus station.  "-- and stress related.  I

6    suppose stress could play a role in this," as I just

7    stated a minute ago, but I also mentioned that he seems to

8    be better.

9    Q.   And then with regard to the next paragraph down, the

10   "ulnar neuropathy"?

11   A.   So, again, that would be my impression or diagnosis.

12   "Neuropathy," being a general term that could encompass

13   trauma to a nerve, nerve symptoms of any kind.  And I

14   mentioned that the symptoms had improved, and that he did

15   have some residual symptoms.  So he is still having some

16   symptoms in his right hand and fingers.

17        And I mentioned that -- an idea for myself or,

18   perhaps, another provider reading the medical record, an

19   idea for pursuing this further would be to refer to

20   neurology.  And when I say "more objective measures," that

21   would more typically be some nerve testing.

22   Q.   Did you and Mr. White discuss whether or not you

23   would do that?

24   A.   Yes.  So, the last sentence, although it is brief,

25   discusses that, because his functioning is reasonably

 1    well, we elected to hold off on the workups.  So that says

 2    that we elected to hold off on doing these tests, because

 3    we had a discussion about what the tests might involve,

 4    what they could accomplish, and what potential treatments

 5    might result after doing objective testing.

 6          So after that discussion, we decided to hold off on

 7    doing that testing.

 8    Q.   And given the fact that he still was complaining of

 9    this ulnar neuropathy, why is it that you and Mr. White

10    together decided that it didn't make sense to continue and

11    take some more radical measures?

12    A.   Right.  So, depending on the severity of the symptoms

13    or dysfunction it might cause for a patient, we might

14    decide to go forward with the testing, which is mildly

15    invasive and includes putting needles into the skin to

16    test nerves.  Then the treatments might be expected to be

17    medications.  In other words, there wouldn't be likely a

18    surgical procedure to fix a nerve like that, so it might

19    involve taking a medication.

20          These medications often can have side effects that

21    potentially might be worse than the symptom of the hand

22    numbness, itself, like sedation or other things like that.

23    Q.   Drowsiness, lack of alertness?

24    A.   Correct.

25    Q.   To wrap things up, what is your medical prognosis for

1    Mr. White specifically relating to this ulnar neuropathy

2    you have diagnosed?

3    A.   So, based on what I'm reading here, my assessment,

4    and my narrative, it seemed like it was getting better.

5    But I wouldn't be surprised if he might have some residual

6    numbness or other complaints, or he still could continue

7    to get better.  After a year, after that type of injury,

8    then the chances that it will completely resolve start to

9    diminish.  But then after 2 years, it is generally thought

10   that those types of symptoms are not likely to continue to

11   get better after that time frame.

12   Q.   So if Mr. White is still complaining about some of

13   this neuropathy, what does that tell you?

14   A.   So, based on this time frame, I would tell a patient

15   like that that it may not get a lot better at this point.

16        MS. NEWMAN:  Thank you very much, Doctor.  Those

17   are all of my questions.

18        THE COURT:  All right.  We have been sitting for

19   about 2 hours.  If you don't mind, we will take a short

20   break.  We will reconvene at 3:35.  So a 15-minute break.

21   We will be in recess until 3:35.

22        Ladies and gentlemen, you are not to discuss this

23   case among yourselves.  We will be back in session at

24   3:35.

25        (A break is taken from 3:21 p.m. to 3:36 p.m.)

1          THE COURT:  All right.  You may be seated.

2     Ms. Barnes, will you please bring in the jury.

3          Mr. Lyons, you may proceed.

4          MR. LYONS:  Thank you, Your Honor.

5                    **CROSS-EXAMINATION**

6     **BY MR. LYONS:**

7     Q.   Dr. Dent, I am Tom Lyons.  I represent Officer Chafin

8     and Lieutenant Wyckoff in this matter.

9          Doctor, you told us that you had spoken with

10    someone, or you had seen a record yesterday for the first

11    time.  Do you remember that?

12    A.   Yes.

13    Q.   Okay.  And can you tell the jury, please, in what

14    context did you see that document?

15    A.   Are you referring to the document that you objected

16    over?

17    Q.   Yes.  In what context did you see it?

18    A.   I was sitting down with Ms. Newman looking at it, in

19    her office.

20    Q.   All right.  And so you spent some time preparing your

21    testimony with her yesterday; correct?

22    A.   That's correct.

23    Q.   How long was that?

24    A.   About 2 hours.

25    Q.   I see.  Had you ever done such a thing previously

1    with Ms. Newman?

2    A.    No.

3    Q.    Okay.  Tell us what you looked at, besides the record

4    I objected to.

5    A.    So, we looked at all of the records that were

6    presented to me on the screen, including the emergency

7    room visit and my own records.  There was a document from

8    Boulder Community Hospital.  And I was also presented with

9    a transcript from a deposition that Mr. White had taken

10   before.

11   Q.    Anything else?

12   A.    No.

13   Q.    And had you reached any conclusions about the

14   situation here today that you've confronted by being a

15   witness, before you sat down with Ms. Newman?

16   A.    I haven't reached any conclusions.

17   Q.    Okay.  Had you reached any determination about such

18   things as, determining things to a reasonable degree of

19   medical certainty?

20   A.    Do you mean since I saw the patient or --

21   Q.    Before you spoke to Ms. Newman.  Sir, I am sorry to

22   interrupt you.

23   A.    Had I reached any conclusions about my assessments of

24   the patient?  Yes, I had, before I met with Ms. Newman.

25   Q.    Well, I understand.  But what I asked is whether or

1    not you had ever heard the words "reasonable degree of

2    medical certainty"?

3    A.    I have heard those words before, but that wasn't a

4    phrase that was used in our meeting yesterday.

5    Q.    Did she tell you what that meant?

6    A.    No, she never defined it for me.

7    Q.    Do you know what it means?

8    A.    Yes.

9    Q.    What does it mean?

10   A.    A reasonable degree of medical certainty is taking

11   the facts that are identifiable through the story told,

12   the objective findings, perhaps on exam or on any kind of

13   tests or x-rays, and then deciding that if it was probable

14   that these things were the result of something or not.

15   Q.    What I heard you testify to earlier, sir, was that

16   your determinations respecting the reasonable degree of

17   medical probability in regard to your conclusions depended

18   upon your conversations with Mr. White; is that right?

19   A.    That's correct.

20   Q.    And no other?

21   A.    No other conversations.

22   Q.    Nothing else?

23   A.    That's correct.

24   Q.    All right.  So you never, for example, performed a

25   pinprick test on his finger to see whether it was numb,

1    did you?

2    A.   That's correct.

3    Q.   You never checked to see whether there were any kind

4    of limitations associated with the use of his hands, in

5    the form of reading Braille, that would be affected by any

6    numbness that he reported?

7    A.   I did make an observation about his motor functioning

8    by observing the patient.

9    Q.   I understand that you did that, sir.  But what I

10   asked you had to do with reading Braille.  As I understood

11   your testimony -- you don't know how to read Braille, do

12   you?

13   A.   No, I don't.  I read print.

14   Q.   Did you want to say something further?

15   A.   I read print.  I don't read Braille.

16   Q.   Thank you.  As a result of your not reading Braille,

17   you don't know how fingers are used to read Braille, do

18   you?

19   A.   No, I don't.

20   Q.   What is a neurologist?

21   A.   That is a physician that specializes in disorders of

22   nerves and the central nervous system.

23   Q.   Did you refer Mr. White to a neurologist in relation

24   to this?

25   A.   I did not.

1    Q.   And as a consequence of that -- that is a

2    possibility, though, as I understand it; right?

3    A.   One of the possible management plans for the patient?

4    Q.   Right.

5    A.   Yes.

6    Q.   Another would be nerve conduction studies, I take it

7    from what you testified to; is that right?

8    A.   That's right.

9    Q.   That is a test where you check to see whether or not

10   the electrical impulses in your nerves are actually being

11   transmitted through particular areas where the nerve runs;

12   right?

13   A.   That's right.

14   Q.   So we don't have any idea what that circumstance is

15   with Mr. White in relation to such a test result; right?

16   A.   That test was not done on this patient.

17   Q.   And your conclusion was that between the two of you,

18   his function was such that there wasn't a justification to

19   do it, as I heard your testimony?

20   A.   That's correct.

21   Q.   So that means it is not much of a circumstance.

22   There isn't much impediment; right?

23   A.   That's correct.

24   Q.   Even by what he says; correct?

25   A.   You are asking if there was not much of an impediment

1    as to what he said?

2    Q.   No.  Sorry, it is a horrible question.  I will try

3    again.

4    A.   Okay.

5    Q.   What I am asking is whether or not, just based on

6    what Mr. White said, you could tell it is not a

7    significant circumstance?

8    A.   Right.  So he still wasn't able to read Braille.

9    Q.   Okay.  And you said something about "normal."  The

10   reading of Braille in the normal sense.  Do you remember

11   that --

12   A.   Yes.

13   Q.   -- in your note?

14   A.   Yes.

15   Q.   Okay.  What is "normal"?

16   A.   Well, I would assume it would vary from person to

17   person.  Some people might have more expertise at it, more

18   experience.  But it would be perceived by the person doing

19   it, whether or not it was slower or faster.

20   Q.   Well, I used to be able to turn and make a hook shot

21   a lot quicker when I was a young man than I could today.

22   I don't even know if I could make a hook shot.  But that

23   is a function of age, too, isn't it?

24   A.   Well, you are referring to an athletic endeavor.

25   Q.   Well, I am referring to a physiology, sir, as people.

1    A.   I think you referred to a basketball hook shot.  I

2    don't read slower now that I am older.  I can't play

3    hockey as fast as I used to.

4    Q.   Can you move your hand as fast as you used to?

5    A.   In the sense of following print on a page, yes, I can

6    move it just as fast as when I was younger.

7    Q.   How many bumps on a page, you don't know?

8    A.   I don't know.  I don't use bumps.

9    Q.   What is the purpose of a medical record?  I know you

10   talked about that with Ms. Newman a little bit.  Tell me,

11   what is the purpose of a medical record?

12   A.   So, like I described before, a medical record helps

13   the treating physician to remember what had occurred to

14   the patient and what impressions he had formed or

15   diagnoses and what treatment plans were to be done.  It

16   can include test results.  It can be used by another

17   provider, physician, nurse, any other medical provider for

18   the same purposes.

19        And it also serves to stand should there be a

20   question or legal question in a court of law.

21   Q.   One of the things that happens with your medical

22   records -- and I understand that your transcriptionist is

23   perhaps not as up to the minute as some may be, but your

24   transcriptionist will give you a medical record about a

25   week after a visit with a patient, and then you will be

```
 1    given the opportunity to review and sign that; right?

 2    A.   That is not the way this medical record works.

 3    Q.   Which one is that, sir?

 4    A.   The one -- my medical records are from a voice

 5    recognition system.  So it is not sent for transcription.

 6    Q.   When it says it is signed electronically, you don't

 7    review it and sign it?

 8    A.   Well, I do review it and sign it, yes.

 9    Q.   Okay.  So that means you are saying this is my

10    record, I did this?

11    A.   Correct.

12    Q.   And if it says nothing about, say, for example, which

13    hand it is that is numb, just as an example, it is on you;

14    am I right?

15    A.   Correct.

16    Q.   And if your records don't reflect that you even noted

17    the patient being a blind person, that is on you, too;

18    right?

19    A.   Sure.

20    Q.   So, insofar as that is concerned, one of the things I

21    note in your record is you use the phraseology a couple of

22    places "history of present illness."  Then you go through

23    not the history of the patient entirely, just what brought

24    him there for that visit; am I right?

25    A.   Correct.  Are you referring to a specific --
```

1    Q.   Just in general.

2    A.   Just in general, the history of present illness

3    refers to why they are there today, yes.

4    Q.   So, at the top of the page, if you want to look at

5    Exhibit 25, I think it is, or 24, I think, is the right

6    one for you to look at right now, at the top of your page,

7    there is a number, and it says "History and Physical

8    Report No. 8," just for an example.  Do you see that?

9    A.   Am I supposed to be seeing it?

10           THE COURT:  Do you wish to have this published?

11           MR. LYONS:  Yes, Your Honor.  This is admitted.

12           THE COURT:  You always have to ask me.  That is how

13   Ms. Barnes knows to turn on the monitors.

14           MR. LYONS:  I beg your pardon.

15   Q.   (BY MR. LYONS)  Are we there?  "History and Physical

16   Report No. 8."  Do you see that?

17   A.   "History" and "present history."

18   Q.   "History and Physical Report" very first line?

19   A.   Yes.

20   Q.   Big bold print?

21   A.   Yes, I see it.

22   Q.   If we take a look at that one, then compare it to No.

23   27 -- and you don't need to do it right this minute -- I

24   will represent to you No. 27, the exhibit that is also

25   admitted and that we will publish, perhaps, in a moment,

1    says "History of Physical Report 17."  No. 17.

2        In your office, do you use these records in a

3    serial fashion, so each visit gets a new history and

4    physical number?

5    A.   I am not aware of that mechanism.  It is possible.

6    That is not the area where I focus on.

7    Q.   So you don't know whether your own records -- let's

8    start another way.  Yesterday when Ms. Newman --

9    A.   They are by date.

10   Q.   If you let me, Dr. Dent, I want to make sure I get

11   the question put to you.

12       Yesterday, when you were with Ms. Newman and you

13   were going over the testimony you were going to offer here

14   today, did you look at your entire chart for Mr. White?

15   A.   I don't believe so.

16   Q.   Do you have more than the two entries we put into

17   evidence here today --

18   A.   Yes.

19   Q.   -- in your chart for him?

20   A.   I do.

21   Q.   Do you have visits with him that would show at the

22   top of the page history and physical reports and a serial

23   of numbers, do you know?

24   A.   I would have reports that say "history and physical

25   reports."  And the number, I am not sure about.

1    Q.   Okay.   Perhaps we can refresh your recollection with

2    those documents?

3         MR. LYONS:   Your Honor we have previously marked,

4    but we don't intend to offer -- this is for the purpose of

5    refreshing recollection of the witness.

6         THE COURT:   All right.

7         MR. LYONS:   If I may approach the clerk?

8         THE COURT:   You may approach Ms. Barnes.

9         And, Ms. Newman, are you aware of this?

10        MR. LYONS:   This has been marked as Trial Exhibit

11   47, as part of the chart of Dr. Dent, and provided in the

12   course of discovery by plaintiff's counsel in this matter.

13        MS. NEWMAN:   Your Honor, I have never been shown

14   this exhibit, although I am sure Dr. Dent --

15        THE COURT:   I don't need a speaking objection.   Do

16   you have any objection to it?

17        MS. NEWMAN:   I would need to look at it first.   His

18   entire medical chart?

19        MR. LYONS:   It is a serial representation of the

20   serial numbers and the chronology of events.   Contents

21   thereof will not be --

22        THE COURT:   It is for refreshing his recollection

23   as to whether there are numbers at the top.

24        MS. NEWMAN:   I don't have an objection to taking a

25   look at his medical records.

156

1            THE COURT:  You may proceed.

2            MR. LYONS:  Thank you.

3    Q.   (BY MR. LYONS)  What has been put in front of you,

4    marked as trial Exhibit No. 47, purports to be a medical

5    chart; am I correct?

6    A.   Right.

7    Q.   Does it appear to be in the form of your medical

8    chart --

9    A.   It does.

10   Q.   -- for Mr. White?

11   A.   For Mr. White, yes.

12   Q.   If you look through those pages there, you see at the

13   top of the page, don't you, multiple history and physical

14   reports with serial numbers; am I right?

15   A.   Yes, you are correct.

16   Q.   And so let's just go back to No. 8, for example, just

17   to put it in context of time on this.  That would be the

18   same one that is in evidence here as trial Exhibit 26; am

19   I right?

20   A.   Which one are you referring to?

21   Q.   The last one in the pile, which is 8, last two pages,

22   bottom of the page, is marked --

23   A.   No 8?

24   Q.   At the top.

25   A.   No. 8.

1    Q.    You have that?

2    A.    I have it, yes.

3    Q.    Next one above that is 9; right?

4    A.    Correct.

5    Q.    They run all of the way up through 16.  Then there is

6    18; am I correct?

7    A.    Yep, that's correct.

8    Q.    So if I were to understand how you do things in your

9    office, it appears to me as if each time there is a visit,

10   there is a history and physical document reported or

11   created.  You sign off on them.  And they show their

12   chronology, both by their date, as well as by the number

13   that is at the top of the page; is that right?

14   A.    Correct.

15   Q.    And those that you have in your hand, up through the

16   date of the 16th version, the 16th version, which happens

17   to be dated October 24, 2013, right, you have that one?

18   A.    Yes.  October 24, 2013.

19   Q.    So that shows what happened in terms of your office

20   interacting with Mr. White between June 28, 2012, and

21   October 24, 2013, but you didn't look at those yesterday,

22   did you?

23   A.    That's correct.

24   Q.    All right.  And you don't have any idea whether they

25   say anything in them about numbness, do you?

158

```
 1    A.   You are asking if I don't have any idea -- talking

 2    about numbness, that is correct, I haven't reviewed those

 3    recently.

 4    Q.   Ms. Newman didn't show them to you.

 5    A.   That's correct.

 6    Q.   They also don't say anything, as far as you know of,

 7    anyway, right now, about any temporal mandibular joint

 8    problem; correct?

 9    A.   So, on the 24th of 2013, is that the one you are

10    referring to?

11    Q.   I am talking about all of them, sir.  I am asking, do

12    you know whether or not there is any mention of temporal

13    mandibular joint?

14    A.   As we were talking, I am noting it was part of the

15    October 24 visit.  I wouldn't know if you didn't put this

16    in front of me.

17    Q.   You don't know if any of the rest of them have

18    anything to do with that; correct?

19    A.   At this point, no.

20    Q.   Furthermore, Doctor, in conjunction with this, there

21    is a report up there, a "History and Physical Report No.

22    18," isn't that right?

23    A.   No. 18, yes.

24    Q.   At the top.  Got it?

25    A.   Yeah.
```

1    Q.    It is dated January 17, 2014; right?

2    A.    Correct.

3    Q.    And you really read fast, because you read the other

4    one.  So read, just for your own purposes of refreshment,

5    to yourself the history of present illness on that page.

6          MS. NEWMAN:  Which page are you referring to?

7          MR. LYONS:  Bates No. 75.

8          MS. NEWMAN:  Thank you.

9          THE WITNESS:  Yes.  History of prevent illness, got

10   it.

11   Q.    (BY MR. LYONS)  So this time Mr. White comes again to

12   see you; right?

13   A.    Correct.

14   Q.    January 2014?

15   A.    Correct.

16   Q.    And he tells you then that, one, he had a thumb

17   fracture as a young person; right?

18   A.    Yes.

19   Q.    Now, interestingly, when that x-ray report you looked

20   at from St. Joseph Hospital was reviewed by you, whoever

21   read that as radiologist didn't know that there was an old

22   fracture visible near the base of his thumb; is that

23   right?

24   A.    He said there was no fracture visible; correct.

25   Q.    But Mr. White told you he had one from a skiing

1    accident; right?

2    A.   I don't remember if it was a skiing accident.

3    Q.   He told you he had one, didn't he?

4    A.   He told me there was a thumb fracture, yes.

5    Q.   Okay.  And that is the first time he told you that;

6    right?

7    A.   I believe so.

8    Q.   And, furthermore, he told you his right hand, he

9    thought, was being impeded in some sense, he says, he

10   attributes some of his wrist pain to using his cane;

11   right?

12   A.   Yes.  That's -- yes.

13   Q.   Do you doubt it?  Do you doubt that he told you that?

14   A.   Do I doubt what?

15   Q.   That Mr. White told you his wrist pain was the result

16   of using his cane?

17   A.   I don't doubt it.

18   Q.   You think Mr. White tells you the truth?

19   A.   Yes.

20   Q.   You think that is important for you to be able to

21   make good decisions about how to take care of somebody;

22   isn't that right?

23   A.   Yes, that's important.

24   Q.   So if Mr. White comes to you and he says, I have

25   numbness on the pinky side of my thumb, or he said I have

1    whatever, whatever it is, you trust him?

2    A.   He said the pinky side of his thumb?

3    Q.   I am just using it as an example.  I don't know what

4    he actually said.  But, just as an example, if he comes

5    and tells you that, you depend on it?

6    A.   That's right.

7    Q.   You have course-of-treatment decisions to make

8    grounded on what he told you?

9    A.   Correct.

10   Q.   All right.  And if he doesn't tell you all of the

11   story, that is the same as not telling you any of story,

12   isn't it?

13   A.   No.

14   Q.   What is the difference?

15   A.   So if he told me some of the story but left out

16   something, I wouldn't equate that with telling me none of

17   the story.  Is that the question?

18   Q.   Let's look at it this way.  If he told you something

19   about his health but omitted that he was engaged in an

20   activity that was dangerous, just like I am sure patients

21   come to you and don't tell you they are using drugs;

22   correct?

23   A.   Correct.

24   Q.   And yet you can tell, you said to Ms. Newman,

25   sometimes you can even tell if somebody is using drugs

1   because of what you can observe, you can see that they

2   are; right?

3   A.   That's correct.

4   Q.   So sometimes that means you alter your treatment

5   course based on what you've observed regardless of what

6   the patient says?

7   A.   That's correct.

8   Q.   Okay.  In this case, did you do that?

9   A.   So, are you referring to the wrist pain towards the

10  bottom?

11  Q.   I am referring to any point in time that you visited

12  with Mr. White and tried to give him treatment.

13  A.   It appears under "wrist pain," that he likely had

14  some osteoarthritic changes in that area.  Since things

15  are doing much better now, we agreed to let him do

16  conservative measures and follow up if it worsens.

17  Q.   That is with regard to the wrist pain he was

18  complaining to you about on January 17, 2014; is that

19  right?

20  A.   That's right.

21  Q.   And where does it say anything about numbness on that

22  one, since you are looking at that one?

23  A.   So, under the "review of systems," I said numbness

24  wasn't present; "numbness paresthesias not present."

25  Q.   So you told Ms. Newman awhile ago that after 2 years,

1   if you still have numbness, then it will probably not go

2   away, but it did; right?

3   A.   Well, it appears -- this could be referencing a

4   different part of his anatomy.

5   Q.   Very good point, Doctor.  Let's make sure.  So you

6   can be numb anywhere; correct?

7   A.   Yes.

8   Q.   And, in fact, one of the things that happened when

9   you did your visit with him in June of 2012, is you noted

10  that he said the numbness was resolved.  But then when you

11  did the coding, you said "numbness" as a code on that

12  history and physical that represents Exhibit 26; isn't

13  that right?

14  A.   Exhibit 26 was the one where I believe you are

15  referring to when I used the word "ulnar neuropathy."

16  Q.   No, sir.  Let's get it up.  That will be the easiest

17  way.  Let's get No. 26 up.

18       MR. LYONS:  If we could publish, please, Your

19  Honor.

20       THE COURT:  You may.

21  Q.   (BY MR. LYONS)  So there you say -- let's look under

22  "History of Present Illness."  I am sorry, my eyesight

23  isn't as good as it once was.  It says, "She reports

24  having some numbness in his hands, but this has resolved."

25  Do you see that?

164

1    A.   I am sorry?  "She reports having some numbness in his

2    hands, but this has resolved."

3    Q.   "Resolved" means it's gone?

4    A.   Generally, yes.

5    Q.   What else could it be?

6    A.   It means it's gone.

7    Q.   Then it says, "This was associated --" that means

8    whatever he had before, was as far as he said to you, "--

9    with his being recently arrested for an episode at the bus

10   stop"?

11   A.   Right.

12   Q.   And then you say, the last sentence there, "The

13   numbness has resolved."  Again, is that a yes?

14   A.   Yes, I see that.

15   Q.   Okay.  Then under "Neurological," it says "Present

16   Numbness."  Do you see that?

17   A.   Yes.

18   Q.   So there is a dichotomy there, isn't there?  On the

19   one hand you say there is numbness.  On the other hand,

20   you say the numbness has resolved?

21   A.   Right.

22   Q.   Then you told the jury numbness can be anywhere;

23   right?

24   A.   You mean -- you just asked me if numbness could be

25   anywhere.  I think you just asked that in a separate

1    context.

2    Q.   Let's go back to this context now, sir.

3    A.   So you are asking where is there a dichotomy that it

4    is now resolved, but now numbness is present?  So I would

5    say, yes, I should have made a notation on that "Review of

6    Systems," but since it was, I feel, clarified up top, I

7    would hold the "History of Present Illness" to have more

8    weight than that part of the history.

9    Q.   I get it.  So some of these records, you don't depend

10   on nearly as much as other parts; is that it?

11   A.   Say that again?  I am sorry.

12   Q.   Some parts of the records don't matter nearly as much

13   as other parts?

14   A.   Some parts of the record, when you read it as a

15   physician, do count more, yes.

16   Q.   Including what your patient tells you?

17   A.   Including what the patient says is important.

18   Q.   Right.  So on January 14, 2014, or January 17, 2014,

19   when Mr. White told you the numbness was gone, you relied

20   on that, didn't you?

21   A.   On January 17?

22   Q.   2014.

23   A.   2014, yes.  Yes.

24   Q.   From that day to this, he didn't have any numbness

25   that you know about; correct?

1    A.    Correct.

2    Q.    So let's talk about Exhibit 22.   Do you remember that

3    one, the St. Joseph Hospital record?

4    A.    Yes.

5    Q.    You examined that?

6    A.    Yes.

7    Q.    When?

8    A.    From Exempla?

9    Q.    Yes.

10   A.    Yesterday.

11   Q.    For the first time?

12   A.    I believe so.

13   Q.    You had never seen it before?

14   A.    Well, I am not entirely positive about that.   Some of

15   the records were sent to me.   But I don't believe that was

16   one of them.

17   Q.    When?

18   A.    I am sorry?

19   Q.    When was it sent to you, sir?

20   A.    I actually am saying I am not totally sure.   I know

21   for certain a record from Boulder Community Hospital was

22   sent to me.   But I don't believe the one from Exempla was

23   sent to me.

24   Q.    Let's go back to the TMJ.   You just reminded me of

25   something.   So TMJ can happen, as far as I know, at least,

1    from people who grind their teeth; isn't that right?

2    A.    Correct.

3    Q.    There are a lot of causes of TMJ that family doctors

4    recognize and diagnose regularly; right?

5    A.    Correct.

6    Q.    How did Mr. White have his head injury inflicted?

7    A.    He appears to have had his forehead --

8    Q.    I didn't ask you what appears, I wonder how did it

9    happen?  Do you know?

10   A.    A police officer forced him into a counter at the bus

11   station.

12   Q.    How do you know that?

13   A.    I saw some video of it.

14   Q.    You saw on the video that Mr. White's head struck the

15   counter?

16   A.    No.  It is not a positive identification of that

17   mechanism.

18   Q.    You couldn't see that happen?

19   A.    I could not see that exactly happen.

20   Q.    So when you say somebody forced his head somewhere,

21   how do you know that?

22   A.    I don't know for sure it was the counter.

23   Q.    That is what Ms. Newman told you?

24   A.    Correct.

25   Q.    Not even Mr. White?

1    A.   Correct.

2    Q.   So, insofar as that is concerned, if you look at the

3    picture, which we have as Exhibit 1, I think on the third

4    page, where you can see the cleaned up wound, there is an

5    abrasion.  You called it an abrasion.  When you look at

6    that, you can tell, can you not, that what happened is the

7    skin has been skimmed or scraped off of his head?

8    A.   I agree with that.

9    Q.   So if his head was slammed into something, as you

10   just said Ms. Newman told you it was, how would that have

11   caused his skin to be scraped, do you know?

12   A.   That type of mechanism could cause your skin to be

13   scraped.

14   Q.   How?

15   A.   The friction from the blow.

16   Q.   From a single blow like that?

17   A.   I am saying that that type of injury could be caused

18   by a blow, but it could have other ways.

19   Q.   Sure.  For example -- if, for example, Mr. White, in

20   the course of being handcuffed, moved his head like this

21   (indicating) and there happened to be a surface on the

22   side that caused his skin to be scraped off by the counter

23   surface, that is just as good as an explanation as any for

24   what happened, isn't it?

25   A.   It could be one possible explanation for that type of

1    injury.

2    Q.   Just like having your head slammed is possible?

3    A.   That's correct.

4    Q.   Let's go back to Exhibit 22.  Now, I am sorry, when

5    we do this, it gets to the point where we have a lot of

6    nomenclature running around, and it makes it confusing for

7    the witness.  So we are talking about Exhibit 22, the

8    Exempla record you examined yesterday with Ms. Newman, for

9    what may have been the very first time; correct?

10   A.   Correct.

11   Q.   So when you looked at that and you saw in there that

12   record, you saw that Dr. Pei had to do, what I found to be

13   an extraordinary attestation, that says that it is his

14   knowledge.  He knows the content of those records.  Do you

15   notice that?  Would you like to take a look at those?

16   A.   That he knows the context of the record?

17   Q.   Right.  Let's get it up, Exhibit 22.

18        MR. LYONS:  This is admitted, Your Honor.  I would

19   like to have it published.

20        THE COURT:  You may.

21   Q.   (BY MR. LYONS)  Let's see.  Let's go to the fourth

22   page -- sixth page, if we could.  Right at the bottom of

23   what is marked for purposes of the Bates label as 41, it

24   must be the seventh or eighth page of Exhibit 22, where it

25   says "Attending Attestation."  Do you see that?

1    A.    Yes.

2    Q.    It says, "I have personally seen and examined this

3    patient."  Then we have to skip to the next page.  "I

4    fully participated in the care, reviewed all pertinent

5    clinical information, and agreed with the management and

6    disposition of this patient.  Nursing records reviewed,

7    and agree with the nursing records, except as presented in

8    physician documentation."  Do you see all of that?

9    A.    Yes.

10   Q.    You don't attest to anything like that, do you, when

11   you sign off on medical records?

12   A.    I don't put those attestations on my records.  This

13   appears to be an attending physician, different than

14   Dr. Pei.

15   Q.    You know a lot more about doctors than I do, I am

16   sure.  But whoever it is, is saying that is the truth.

17   Isn't that what you take this to mean?

18   A.    Those types of statements are sort of boilerplate, if

19   I might use that language.  They are often stamped on

20   there.  But I do believe someone is going to place that in

21   the medical record, that I believe that they reviewed the

22   case with Dr. Pei.

23   Q.    Usually we trust doctors?

24   A.    I believe that he did.

25   Q.    Okay.  So if there is a patient that is there and

1    says "the cops beat me up for 12 hours," and that is in

2    the medical records, that means this doctor believed that;

3    isn't that the case?

4    A.   This doctor believed that, yeah.

5    Q.   Further, if there is an indication in this on record

6    that Mr. White shook his cane in the face of one of the

7    nursing students because he was angry and agitated, that

8    the doctor believed that; isn't that right?

9    A.   Because that is in the medical record?

10   Q.   Right.

11   A.   Yes.

12   Q.   But you don't believe that, do you?

13   A.   Well, I don't necessarily know that every doctor

14   reviews every entry that a nurse puts in the medical

15   record, but I am not saying he didn't review that.  That

16   could occur.

17   Q.   It is evidence in this case.  Do you think we should

18   ignore it?

19   A.   You are asking me if I believe he shook his cane in

20   the face of a nursing student?

21   Q.   I am asking you whether that is in that record, and

22   it is keeping with your expectation on the recordkeeping

23   for medical treatment to be provided to individuals and

24   relied upon by others who will subsequently review it?

25   A.   Okay.  So you are asking me --

1    Q.   It is a yes or no question.  Is it or isn't it?  Do

2    you want the question re-read?

3    A.   I am not trying to be rude.  Say that question

4    entirely one more time.

5    Q.   It is time, that is what is pushing me.

6    A.   Absolutely.

7    Q.   If somebody looks at that record, right, and as far

8    as they can tell, that is a record attested to by the

9    physician who was taking care of Mr. White.  You are

10   nodding your head?

11   A.   Yeah.

12   Q.   You've got me so far.  Then that person wrote it, in

13   the expectation that it would be relied upon by me or

14   anyone else who read it?

15   A.   That's correct.

16   Q.   Did you talk to Dr. Pei?

17   A.   No.

18   Q.   Have you talked to any other doctor about Mr. White?

19   A.   No.

20   Q.   Mr. White told you multiple times about his level of

21   activity, and you noted it in your records; isn't that

22   right?

23   A.   Yes.

24   Q.   You noted in your records multiple places that he is

25   very physically active?

1    A.   Correct.

2    Q.   You did?

3    A.   I agree.

4    Q.   You noted that he rode a tandem bike?

5    A.   I know he has ridden a tandem bike.

6    Q.   You know he told you he rode a tandem bike?

7    A.   I don't recall that fact, but I might have documented

8    it.

9    Q.   Let's go back to the exhibit.  And I will get you the

10   date for that one.  This one is dated March 7th of 2013, I

11   think it is.  Down under "Exercise History," do you see

12   that?

13   A.   The 7th of March 2013?

14   Q.   Yes.

15   A.   Okay.

16   Q.   That is where he told you about his physical

17   activity?

18   A.   Right.

19   Q.   That is a year -- almost a year after the events that

20   brought us here today; right?

21   A.   Correct.

22   Q.   You are nodding your head?

23   A.   Yes, sir.

24   Q.   You care, especially with someone who is 77, 78, 79

25   years old, as Mr. White has been during the course of this

1    case coming to trial, about the level of activity of an

2    individual, don't you?

3    A.   I care about the activity of the individual, yes.

4    Q.   And he told you, because that is why you asked him

5    the question, you wanted him active; right?

6    A.   Yes.

7    Q.   Did he ever tell you anything to indicate that that

8    information wasn't true?

9    A.   Well, that information may have been specifically

10   discussed.  For instance, the tandem bicycle on that date,

11   but it is possible it could have been discussed at another

12   date.

13   Q.   It was.  In fact, if you look through the rest of

14   your records, there are several places it is noted.  Do

15   you believe me?

16   A.   I believe you.

17   Q.   Mr. White made a big point of telling you he was very

18   active, didn't he?

19   A.   Yes.

20   Q.   You were glad, because that is good for him?

21   A.   Right.

22   Q.   So as far as that is concerned, there is nothing that

23   I saw in your records to indicate that there was a

24   diminution, a decline in his level of physical activity.

25   Do you know of any such thing?

1   A.   That there is anything in the record about a

2   diminution of his activities?

3   Q.   Right.  A decline in his level of activity.

4   A.   Not insofar as he rides a tandem bicycle.  But he did

5   relate reading Braille was more difficult at one of those

6   visits, I believe.

7   Q.   One time?

8   A.   One time.

9   Q.   That was once; is that right?

10   A.   Yes.

11   Q.   Did he ever tell you, I can't ride a tandem bike any

12   more?

13   A.   I don't believe that was ever brought up

14   specifically.

15   Q.   Did he ever tell you, I don't cross country ski any

16   more?

17   A.   I don't remember.

18   Q.   Did he ever tell you that he doesn't go walk any

19   more?

20   A.   He did not tell me he doesn't walk.

21   Q.   You told Ms. Newman, and you told the jury, at the

22   behest of Ms. Newman, that you noted that you have seen

23   less of Mr. White in town since when?  I am not sure when.

24   A.   I am not sure what she said.  Had I seen him less,

25   and I thought that perhaps I might have seen him less.

176

1    Q.   Can you relate that to when his son moved 30 miles

2    away from where he lives?

3    A.   I don't know about that.

4    Q.   So you don't know if it may be that you don't see him

5    as much because his son isn't around as much any more?

6    A.   It is possible, yes.

7    Q.   Okay.  Let's see.  You mentioned having looked at

8    some Boulder Community Hospital records in relation, I

9    think that would be, to Mr. White's complaint of jaw pain;

10   is that right?

11   A.   Correct.

12   Q.   And those records came to you sometime in 2013, I

13   think it is August, something like that?

14   A.   That sounds right.

15   Q.   Yet you didn't look at them until 8 months later.

16   And when you got them, you told him to go try some

17   physical therapy; am I right?

18   A.   When I told him, I advised physical therapy; right.

19   Q.   In that 8-month period of time, between when he went

20   to the Boulder Community Hospital complaining about

21   something going on with his jaw, he hadn't come to you and

22   asked for your help on that subject?

23   A.   I don't remember if he came before.

24   Q.   Insofar as that is concerned, one of the notes that I

25   had about this is that -- well, it had been suggested that

1    Mr. White check with his dentist about his situation.  Do

2    you know whether or not he did that?

3    A.   I don't know.

4    Q.   Did you ever talk to his dentist?

5    A.   No.

6    Q.   When you have a temporal mandibular joint problem,

7    are dentists often able to help you take care of it if you

8    are a person suffering in that manner?

9    A.   Sometimes.

10   Q.   You have sent people to dentists for that purpose,

11   haven't you?

12   A.   I would often send them to physical therapy,

13   typically would be my first response.  But I have sent

14   people to dentists.

15   Q.   If you will let me check one thing here, sir.

16        MR. LYONS:  Your Honor, I don't have any further

17   questions for this witness.

18        Thank you very much, Dr. Dent.

19        THE WITNESS:  You are welcome.

20        THE COURT:  All right.  Redirect?

21        MS. NEWMAN:  Thank you, Your Honor.

22                    **REDIRECT EXAMINATION**

23   **BY MS. NEWMAN:**

24   Q.   Hello again, Dr. Dent.

25   A.   Hello.

1    Q.   So, as you discussed earlier, you and I have met

2    before; correct?

3    A.   I am sorry?

4    Q.   As you testified to, in response to Mr. Lyons'

5    questions, you and I have met before; correct?

6    A.   That's correct.

7    Q.   We met specifically with regard to reviewing

8    Mr. White's records in this case; right?

9    A.   That's correct.

10   Q.   Now, did you change any of your medical diagnoses

11   based on anything that I have to say?

12   A.   No.

13   Q.   Would you do that?

14   A.   No.

15   Q.   Did I tell you what you were supposed to tell this

16   jury?

17   A.   No.

18   Q.   Did I ever tell you what your medical opinion should

19   be?

20   A.   No.

21   Q.   You and I reviewed some medical records.  Are you in

22   the habit of reviewing other people's medical records for

23   purposes of diagnosis of your own patients?

24   A.   Yes.

25   Q.   And do those tend to be helpful in terms of helping

1    you diagnose issues that you're also seeing with your

2    patient?

3    A.    Yes, they are often helpful.

4    Q.    Did you find the records from St. Joseph from the day

5    after Mr. White's interaction with the police, to be

6    helpful in putting together the pieces of the various

7    injuries that you described during the course of our

8    questioning?

9    A.    Yes, I did.

10   Q.    Did those records help you come to a conclusion about

11   what you believed were the actual injuries sustained by

12   Mr. White?

13   A.    Yes, they did clarify some things, also in the sense

14   that since he presented the day after that injury, and

15   then applying that to the context of me seeing him perhaps

16   a month later, 18 months later, that that type of

17   evaluation that I did would be different than if I was the

18   physician staffing that emergency department and how I

19   evaluated Mr. White.

20   Q.    Sure.  And, actually, to that end, one of the

21   criticisms of your testimony appears to be that there are

22   various different kinds of medical issues you have seen

23   Mr. White about over the years.  Have you seen Mr. White

24   about all kinds of different things over the course of the

25   5 years you have been his primary-care physician?

1    A.    Yes, I have.

2    Q.    Does the fact that he has various regular medical

3    issues that have nothing to do with this case, mean that

4    he was not injured by the cuffs, as you have described

5    earlier?

6    A.    It does not mean he was not injured by the handcuffs.

7    Q.    Does the fact that he has got the kinds of ongoing

8    medical issues you would expect of an 80-year-old guy,

9    prove anything at all with regard to whether or not he was

10   injured by the conduct of the officers in this case?

11   A.    No, it doesn't prove anything in that regard.

12   Q.    In fact, one of the records that you reviewed is one

13   where Mr. White attributes some wrist pain to his cane.

14   Do you recall those questions with Mr. Lyons?

15   A.    Yes.

16   Q.    Does that lead you to the medical conclusion that he

17   could not also have an ulnar nerve injury, as you

18   previously described?

19   A.    No, it doesn't.

20   Q.    How do those two things interact?  Do they have

21   anything to do with one another?

22   A.    I think in the context of having a previous fracture

23   around the thumb area, being exacerbated by moving a cane,

24   could be related to numbness around ulnar distribution,

25   but likely to be unrelated.

1   Q.   Would it lead to a conclusion that there is not an

2   ulnar issue or ulnar damage?

3   A.   It wouldn't lead me to that conclusion.

4   Q.   Likewise, there was a discussion about the fact that

5   Mr. White is a physically active person, which is to his

6   credit.  Is it your medical conclusion that the fact that

7   Mr. White continues to be physically active means that he

8   did not suffer the ulnar injury that you described

9   earlier?

10  A.   No.  The fact that he is active did not mean he did

11  not suffer that injury.

12  Q.   I am asking these questions so terribly, it makes you

13  end up with double negatives.  I apologize for that.

14       What is your conclusion with regard to the ulnar

15  injury you previously described as relates to the physical

16  activities that Mr. White has engaged in over the course

17  of years?

18  A.   I think he has remained active, because that is the

19  kind of person he is.  And he has sustained an injury that

20  caused some numbness in his hand.  But he has continued to

21  move forward.

22  Q.   Does the fact that the numbness doesn't appear on

23  every single one of your medical records mean that it

24  isn't true?

25  A.   No.

1    Q.   Finally, I hope, does the fact that you didn't refer

2    Mr. White to have additional medical intervention relating

3    to the ulnar injury mean it is entirely resolved?

4    A.   No, it doesn't mean it is entirely resolved.

5    Q.   Why is that?

6    A.   Well, because it may resolve to a degree that we were

7    both satisfied, that he could still move forward with his

8    activities, still read Braille.  And, again, I think we

9    discussed earlier about the nature of those types of tests

10   being somewhat invasive and the potential treatments being

11   limited.

12         So that is why we decided not to pursue workups and

13   testing, neurologist referrals, because his functioning

14   seemed to be as good as it was going to get.

15         MS. NEWMAN:  Thank you very much.  Those are all of

16   my questions.

17         THE WITNESS:  You are welcome.

18         THE COURT:  All right.  Thank you very much, sir.

19         May this witness be excused?

20         MS. NEWMAN:  Yes, Your Honor.

21         THE COURT:  You are excused.

22         THE WITNESS:  Thank you.

23         THE COURT:  All right.  I think we are going to go

24   ahead and recess for the day.  It has been a long day for

25   the jury.  We will continue with the examination of

1    Mr. White tomorrow morning.

2         Remember, ladies and gentlemen, I need you back

3    here ready to go at 8 o'clock, so I can get you out of

4    here by 2:30 to 2:45.  We have to wait for all of you to

5    arrive before we do anything.  Traffic may still be

6    somewhat slow.

7         Remember, you are not to talk to anyone about this

8    case.  You are not to conduct any research.  Bring a lunch

9    tomorrow, please, because we only will have the half hour.

10   Then, what we will do is, I mentioned tomorrow at about

11   2:00 or so, depending where we are with the witnesses, we

12   will take a field trip across the street to the bus

13   station.

14        The jury is excused.

15        (The following is had in open court, outside the

16   hearing and presence of the jury.)

17        THE COURT:  Counsel, anything I need to remain for?

18        MR. KILLMER:  No, Your Honor.

19        MR. LYONS:  No, Your Honor.

20        THE COURT:  If anything comes up, be back here at

21   7:30, and let my staff know.

22        (Proceedings conclude at 4:23 p.m.)

23

24

25

1

2

3              **R E P O R T E R ' S    C E R T I F I C A T E**

4

5          I, Darlene M. Martinez, Official Certified

6     Shorthand Reporter for the United States District Court,

7     District of Colorado, do hereby certify that the foregoing

8     is a true and accurate transcript of the proceedings had

9     as taken stenographically by me at the time and place

10    aforementioned.

11

12

13          Dated this 7th day of December, 2015.

14

15

16

17          _____

18          s/Darlene M. Martinez

19          RMR, CRR

20

21

22

23

24

25